

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-2002

# Swartzwelder v. McNeilly

Precedential or Non-Precedential: Precedential

Docket No. 01-1085

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Swartzwelder v. McNeilly" (2002). *2002 Decisions.* Paper 413.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/413

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 19, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1085

ROBERT SWARTZWELDER

v.

ROBERT W. MCNEILLY, JR.; CHARLES MOFFAT;
REGINA MCDONALD; CITY OF PITTSBURGH,

Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 00-cv-1793)
District Court Judge: Donetta W. Ambrose

Argued on October 17, 2001

Before: ALITO, BARRY, and ROSENN, Circuit Judg es.

(Opinion Filed: July 19, 2002)

SUSAN E. MALIE (argued)
JACQUELINE R. MORROW
City of Pittsburgh
Department of Law
313 City-County Building
Pittsburgh, PA 15219

Counsel for Appellants


ADRIAN N. ROE (argued)
CHARLES B. WATKINS
KENNETH J. WITZEL
Watkins, Dulac & Roe P.C.
150 Gateway Towers
320 Ft. Duquesne Blvd.
Pittsburgh, PA 15222

CRISTOPHER C. HOEL
Schnader Harrison Segal & Lewis
Suite 2700, Fifth Avenue Place
120 Fifth Avenue
Pittsburgh, PA 15222

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

The City of Pittsburgh and three officials of the Pittsburgh Police Bureau (hereinafter "the City") appeal a District Court order granting a motion for a preliminary injunction against the enforcement of Pittsburgh Police Bureau Order No. 53-7 ("Order 53-7") and a subsequent explanatory memo. Order 53-7 requires members or employees of the Bureau to obtain clearance before testifying in court under certain circumstances. Because we find that the District Court did not abuse its discretion in granting the preliminary injunction, we affirm.

I.

Robert Swartzwelder is a police officer who is employed by the Pittsburgh Police Bureau ("Police Bureau") and has acquired expertise concerning the proper use of force by police officers. Beginning in 1996, the Police Bureau and City Law Department asked him to serve as an expert witness in excessive force cases brought against the City and members of the Bureau. He then testified as an expert on the proper use of force and received formal commendations from Police Chief Robert W. McNeilly, Commander Regina McDonald, and the Law Department.

2

Before Swartzwelder's first court appearance as an expert witness, a Police Bureau commander instructed him that, if he was called to testify in any case as a defense witness, he should comply with the Bureau's "Notice Rule," which provided as follows:

> Members or employees summoned or subpoenaed to appear as witnesses for a defendant in a criminal case shall, as soon as possible and practical, but before commencement of the trial, notify the Chief of Police in writing of such fact and the Assistant District Attorney assigned to the case. These appearances for a defendant shall not be made in the official police uniform but shall be made in civilian clothing.

Swartzwelder asserts that he consistently complied with this requirement.

In March 1999, Swartzwelder notified the Police Bureau that he had been subpoenaed to testify as a defense expert in Commonwealth v. Cooperstein. Officer Cooperstein was a member of the Police Bureau who shot and killed a motorist after a high speed chase. After the shooting, Cooperstein was discharged from the Bureau and charged with first-degree murder.

In July 1999, while the Cooperstein case was pending, Chief of Police McNeilly promulgated Order 53-7, which replaced the prior Notice Rule and outlined new procedures with which a Bureau member or employee1  must comply

before testifying in civil or criminal litigation. Order 53-7 provides in pertinent part as follows:

> 4.3 Except for subpoenas issued by the District Attorney's Office, no member or employee may respond to any contact, request, summons or subpoena where such contact, request, summons or subpoena is issued in connection with a criminal or civil proceeding for the purpose of seeking an opinion or advice, expert or otherwise, from the member or

---

1. Order 53-7 refers to a Bureau "member or employee." For simplicity, we will refer simply to "employees."

3

> employee absent express, written authorization from the Chief of Police.
>
> 4.3.1 There is a difference between a subpoena issued to "compel testimony" of a fact witness and a subpoena issued to compel expert "opinion" testimony. A member or employee may be compelled to testify as to the facts or a particular occurrence, but cannot be compelled to give an opinion.
>
> 4.3.2 For this reason, written authorization from the Chief of Police must be given before any member may testify as an expert witness.
>
> 4.3.2.1 In the event that time does not permit the written authorization through the chain of command, by the Chief of Police, a member or employee may seek permission via telephone through the chain of command, and will submit a written Special Report as soon as it is possible and practical.

Appendix at 57.

Thus, Order 53-7 prohibits an employee of the Police Bureau from responding to any "contact, request, summons, or subpoena" seeking "an opinion or advice" in connection with any criminal or civil proceeding unless (a) the information is sought by the District Attorney's Office2 or (b) the Chief of Police provides "express, written authorization" or, where time does not permit, oral authorization. Order 53-7 is not limited to situations in which the "opinion or advice" that is sought is related to the employee's official duties, but the Order is expressly inapplicable to any "contact, request, summons, or subpoena" seeking factual information.

---

2. Read literally, Order 53-7 does not even permit a member or employee of the Bureau to respond to a "contact," request, or summons from the

District Attorney's Office without prior authorization from the Chief of Police. The exception in paragraph 4.3 applies only to "subpoenas issued by the District Attorney's Office." In accordance with the Appellants' Brief, however, we assume that the Order was not intended to impose such a restriction and is simply poorly drafted.

4

After the adoption of Order 53-7, Swartzwelder sent a memorandum to Chief McNeilly requesting permission to testify as a defense expert in the Cooperstein case and two other cases involving the allegedly excessive use of force by law enforcement officers. One of these cases was the prosecution of former Pittsburgh Housing Authority Police Officer John Charmo against murder charges resulting from the 1995 shooting death of Jeron Jackson. The other was a federal case in which Allegheny Township police officers were accused of using excessive force. Both the Cooperstein and Charmo cases produced considerable controversy in the Pittsburgh area.

Chief McNeilly responded to Swartzwelder's request with the following memorandum (hereinafter "the McNeilly Memo" or "the Memo"):

> Please be advised that in any case in which you are subpoenaed you should forward copies of any subpoenas or letters retaining your services as a witness to our Law Department. You should meet with a Law Department representative who will review the matter in any case involving the City of Pittsburgh. In any case involving another municipality, the Law Department should also review that information and notify that municipal government. An assistant city solicitor and the training academy should review the testimony you plan to offer to determine its validity.

Appendix at 58 (emphasis added).

Swartzwelder followed the procedures set out in Order 53-7 and the Memo before testifying in the Cooperstein case. He also followed these procedures in the Allegheny Township case, and he was cleared to testify. In the Charmo case, Swartzwelder again followed the prescribed procedures and attempted for approximately three weeks to obtain authorization. The City Law Department ultimately notified Swartzwelder that it would have to discuss the matter with the Chief of Police and that he would have to obtain written authorization from the Chief before testifying. Swartzwelder was also advised that failure to comply would result in disciplinary action.

5

Swartzwelder then filed this action, contending that Order 53-7 and the McNeilly Memo deprived him of his First Amendment right of free speech. Shortly after filing this lawsuit, Swartzwelder moved for preliminary injunctive

relief. The District Court referred that motion to a Magistrate Judge, and the Magistrate Judge held a hearing. After the hearing, the Magistrate Judge issued a report recommending that Swartzwelder's motion for a preliminary injunction be granted.

The Magistrate Judge first concluded that Swartzwelder was likely to prevail on the merits of the litigation. The Magistrate Judge noted that it was not contested that the speech restricted by Order 53-7 and the Memo related to matters of public concern, and the Magistrate Judge also observed that the Order and Memo restricted speech before it occurred. Accordingly, the Magistrate Judge stated that the City, in order to sustain the restrictions, would have to meet the standard set out in United States v. National Treasury Employees Union, 513 U.S. 454, 468 (1995)("NTEU"), viz., "that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation of the Government.' " Mag. Judge R & R at 13. The Magistrate Judge noted the numerous interests that the City asserted were served by the Order and Memo, including "accounting for its employees' attendance and absence," preventing the disclosure of "confidential or classified matters" or information that could "compromise an ongoing investigation," "maintaining an appearance of impartiality," "being made aware of speech which is potentially disruptive," and verifying that any internal police materials on which an employee intends to rely in his or her testimony are up-to-date. Id. at 11-14. The Magistrate Judge concluded, however, that the City had not shown that the operations of the Police Bureau would be "negatively impacted by allowing its officers to provide expert testimony without adhering to the restrictions set forth in the Order and Memorandum." Id. at 14. In the view of the Magistrate Judge, the Order and Memo were overly broad, and many of the interests that they were claimed to

6

serve could be protected by more narrowly drawn provisions. Id. at 14-15.

Second, the Magistrate Judge held that Swartzwelder had shown irreparable harm " 'since irreparable injury normally arises out of the deprivation of speech rights.' " Id. at 16 (citation omitted). Third, the Magistrate Judge concluded that a preliminary injunction would not cause greater harm to the City because its asserted interests "either are or can be [satisfied] through less restrictive regulations." Id. at 16. Finally, the Magistrate Judge held that a preliminary injunction would be in the public interest since it would prevent curtailment of constitutionally protected speech. Id. at 16-17. For these reasons, the Magistrate Judge recommended that Swartzwelder's motion for a preliminary injunction be granted. After receiving the defendants' objections to the Magistrate Judge's Report and

Recommendation, the District Court issued an order adopting the Report and Recommendation as its opinion and granting the requested preliminary injunction. The City then took this appeal.

II.

In determining whether a preliminary injunction should be issued, a court must consider (1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest. See Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999). We review a District Court's weighing of these factors for an abuse of discretion. Times Mirror Magazines, Inc. v. Las Vegas Sporting News, L.L.C., 212 F.3d 157, 160-61 (3d Cir. 2000). However, determinations made in assessing each factor are reviewed according to the standard applicable to those particular determinations. American Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994). Consequently, legal conclusions are reviewed de novo, and factual findings are reviewed for clear error. See Maldonado v. Houston, 157 F.3d 183 (3d Cir. 1998), cert. denied, 526 U.S. 1130 (1999). In this appeal, the City contends that the

plaintiff did not meet any of the four factors. We will discuss each factor separately below.

III.

In contending that the plaintiff failed to establish a likelihood of success on the merits, the City raises two arguments. First, the City maintains that the District Court should not have applied the legal standard from NTEU. Second, the City argues that, even if the District Court identified the right legal standard, it misapplied that standard.

A.

1. We first consider the City's argument that the District Court applied the wrong legal standard in assessing the constitutionality of Order 53-7 and the Memo. As noted, the District Court applied the standard set out in NTEU, 513 U.S. at 468, viz., whether "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." The City maintains that this standard is inapplicable in the present case because Order 53-7 "is limited to members of a single department and only implicates officers who wish to provide expert advice or testimony regarding law enforcement matters to criminal defendant/litigants." Appellants' Br. at 8. As a result, the City argues, the NTEU

standard does not apply because Order 53-7 does not apply to a "broad range of present and future expression." NTEU, 513 U.S. at 468.

2. The test to be applied when a public employer penalizes a particular employee because of past expression is familiar. While public employees do not give up all "the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest," "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Board of Educ., 391 U.S.

8

563, 568 (1968). When an adverse employment action is taken against a public employee due to the employee's speech, the threshold question is whether the employee's speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Meyers, 461 U.S. 138, 146 (1983); see also Rankin v. McPherson, 483 U.S. 378, 383 (1987). Consequently, where a "public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a [government employer's] personnel decision." Id. at 1447. On the other hand, if the speech relates to a matter of public concern, a court must arrive at a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 142 (quoting Pickering, 391 U.S. at 568); see also Waters v. Churchill, 511 U.S. 661, 668 (1994) (plurality opinion). In performing this balancing, the manner, time, place, and entire context of the expression are relevant. Connick, 461 U.S. at 150. Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388 (citing Pickering, 391 U.S. at 570-73). The Court has described this balancing process as requiring "a fact-sensitive and deferential weighing of the government's legitimate interests." Board of County Comm'rs v. Umbehr , 518 U.S. 668, 677 (1996). Both parts of the Pickering/Connick analysis -- whether employee speech relates to a matter of public concern and whether the employee's interests outweigh those of the public employer -- often require delicate line drawing and have resulted in much litigation in our Court.

3. The present case differs from the typical Pickering/ Connick case in that Order 53-7 restricts employee speech

before it occurs, rather than penalizing employee speech after the fact. In view of this feature of Order 53-7, we agree with the District Court that United States v. National Treasury Employees Union (NTEU), 513 U.S. 454, 468 (1995), is an instructive precedent. See Harman v. City of New York, 140 F.3d 111, 117 (2d Cir. 1998) (applying NTEU to city policy requiring approval for employees to speak to the press); Weaver v. United States Info. Agency , 87 F.3d 1429, 1440 (D.C. Cir. 1996), cert. denied, 520 U.S. 1251 (1997) (applying NTEU to regulations requiring pre-publication review of government employee expression); Sanjour v. EPA, 56 F.3d 85, 90-91 (D.C. Cir. 1991) (en banc) (applying NTEU when regulations impose prior restraints).

In NTEU, a federal statute prohibited government employees from accepting an honorarium for making a speech or writing an article, regardless of whether the speech or article had any nexus with the employee's official duties. See id. at 457. The District of Columbia Circuit struck down the statute, holding that it was fatally overbroad because it was not limited to speeches or articles connected to the employee's government duties. National Treasury Employees Union v. United States, 990 F.2d 1271 (D.C. Cir. 1993). The Court of Appeals wrote:

> To create the sort of impropriety or appearance of impropriety at which the statute is evidently aimed, there would have to be some sort of nexus between the employee's job and either the subject matter of the expression or the character of the payor. But as to many of the plaintiffs, the government identifies no such nexus. . . .

Id. at 1275.

The Supreme Court likewise held that the honoraria ban violated the First Amendment. Justice Stevens's opinion for the Court referred to the standards set out in Pickering, Connick, and related cases but observed that"this case does not involve a post hoc analysis of one employee's speech and its impact on that employee's pubic responsibilities." NTEU, 513 U.S. at 466-67. Noting that the honoraria ban had a "widespread impact" and"chills

potential speech before it happens," the Court held that "the Government's burden [was] greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action." Id. at 468. The Court continued:

> The Government must show that the interests of both potential audiences and a vast group of present and

        future employees in a broad range of present and
        future expression are outweighed by that expression's
        "necessary impact on the actual operation" of the
        Government.

Id. (quoting Pickering, 391 U.S. at 571).

Applying this standard, the Court concluded that the
honoraria ban "unquestionably impose[d] a significant
burden on expressive activity." Id. at 468. On the other side
of the balance, the Court recognized that the government
had a "powerful" interest in preventing misuse or the
appearance of misuse of power in connection with the
receipt of honoraria, but the Court held that the
government had failed to cite any evidence of such
misconduct on the part of the vast majority of lower level
employees who were included within the statute's reach.
See id. at 472-73.

Unlike the Court of Appeals, the Supreme Court did not
explicitly state that a statute such as the honoraria ban
must meet a tailoring requirement, but such a requirement
seems to be implicit in the Court's discussion. The Court
devoted much of its analysis to showing that features of the
statute and implementing regulations were inconsistent
with the government's interest in preventing honoraria
abuse by those (presumably few) employees who were in a
position to do so. The Court stated that although this
governmental interest was strong, the government had cited
no evidence of abuse by "the vast rank and file" of covered
employees. Id. at 472. Similarly, the Court noted that while
payment of honoraria to higher ranking officials might
create an appearance of impropriety, the same could not be
said with regard to the "immense class" of covered workers
"with negligible power to confer favors on those who might
pay to hear them speak or to read their articles." Id. at 473.

11

The Court noted that, while an employee could not receive
an honorarium for a single speech or article even if it was
unrelated to the employee's duties, the ban did not apply to
a series of related speeches or articles unless they had a
nexus to the author's federal employment, and the Court
questioned why individual speeches or articles should be
treated differently. Id. at 473-74. The Court also questioned
the justification for limiting the honoraria ban to
"expressive activities" as opposed to other services that a
government employee might perform during free time and
that might provide a similar opportunity for abuse. Id. at
475. Finally, the Court "attach[ed] significance" to
implementing regulations that "exclude[d] a wide variety of
performances and writings," such as sermons and fictional
writing, from the scope of the ban. Id. at 476. The Court
viewed these exclusions as " 'diminish[ing] the credibility of
the Government's rationale.' " Id. (citation omitted).
Summing up, the Court held that "[t]he speculative benefits
the honoraria ban may provide the Government are not
sufficient to justify this crudely crafted burden on

respondents' freedom to engage in expressive activities." Id. at 477 (emphasis added).

4. With this background in mind, we consider the City's argument that the District Court erred in the present case by judging the constitutionality of Order 53-7 under the NTEU standard. As noted, the City argues that this standard is inapposite because, whereas the NTEU honoraria ban applied to broad categories of speech by nearly all federal employees, Order 53-7 applies only to a much narrower category of speech and only to the employees of a single city department. As the Second Circuit has held, this argument misapprehends the meaning of NTEU. Latino Officers Ass'n v. City of New York, 196 F.3d 458, 463 (2d Cir. 1999); see also Weaver, 87 F.3d at 1439. In the words of the Second Circuit:

> Application of the NTEU standard turns on whether a government employee's expression is restricted "through a generally applicable statute or regulation, as opposed to a particularized disciplinary action" . . . . Weaver v. United States Info. Agency, 87 F.3d 1429, 1439 (D.C. Cir. 1996), cert. denied, 520 U.S. 1251 . . .

12

> (1997). To be sure, the NTEU Court cited the"vast group of present and future employees" and the"broad range of present and future expression" at stake in that case as factors weighing against the government. 513 U.S. at 468 (emphases added). But nothing in NTEU implies that the stricter standard applies only when a "vast group" of employees is involved or when a regulation restricts a "broad range" of expression.

Id. at 464. We endorse this analysis and thus agree with the District Court that NTEU supplies an appropriate standard for judging the constitutionality of Order 53-7 and the Memo.

B.

We now turn to the more substantial task of applying NTEU to the present case. At the outset, we note that Order 53-7 restricts speech on matters of public concern. The principal aim of Order 53-7 appears to be testimony in court by Bureau employees, and we have held that court testimony, whether compelled or voluntary, is always a matter of public concern. See Green v. Philadelphia Hous. Auth., 105 F.3d 883, 887 (3d Cir. 1997) ("[w]e can discern no reason why a voluntary [court] appearance would eliminate the public interest"); Pro v. Donatucci, 81 F.3d 1283, 1291 (3d Cir. 1996) (recognizing that a public employee's court appearance in response to a subpoena is a matter of public concern).3

Because Order 53-7 and the McNeilly memo restrict speech that is a matter of public concern, we must evaluate the interests of the affected employees and the Bureau. On

one side of the balance, it is apparent that important First
_____

3. Insofar as Order 53-7 and the McNeilly Memo regulate other speech --
i.e., instances in which a Bureau employee is solicited for advice or an
opinion outside of court but in connection with litigation -- the regulated
speech may or may not qualify as related to a matter of public concern
depending on the circumstances. We suspect, however, that much of this
additional speech will also qualify as related to a matter of public
concern. Instances in which a Bureau employee is thus solicited for
advice or an opinion that relates only to a matter of private interest are
not likely to be common.

Amendment interests are implicated. As noted, Order 53-7
applies to any effort to obtain a covered employee's"opinion
or advice, expert or otherwise." There are many different
types of opinion testimony that employees of the Bureau
might give that would be of very substantial public concern.
Officer Swartzwelder's area of expertise -- the proper use of
force -- is just one example. Other examples listed by the
City itself are "accident reconstruction, intoxication,
forensic firearms examination, search and seizure
techniques, . . . narcotics issues, crime scene investigation,
witness interview and interrogation techniques and blood
splatter pattern analysis." Appellants' Br. at 20. In
assessing the impact of Order 53-7 on First Amendment
interests, we must keep in mind, not only the interests of
covered Bureau employees in freely expressing their views
but also the interests of "potential audiences." NTEU, 513
U.S. at 467. It is thus apparent that the regulation of
opinion testimony alone imposes a significant burden on
First Amendment interests.

On the other side of the balance, the City has asserted a
panoply of interests. While all of the asserted interests are
legitimate, some appear to have little relationship to the
Order and Memo. Others are more relevant, but the Order
and Memo are not carefully crafted to serve them.

We will begin with the City's asserted interest in keeping
track of the location of employees who are testifying. While
this is certainly a legitimate interest, it is obvious that
Order 53-7 is poorly suited -- and was probably not
designed -- to serve this end. If the City's interest is in
keeping track of the whereabouts of employees, why is
Order 53-7 limited to employees who are giving opinion, as
opposed to factual, testimony? Why does the Order require
clearance of the substance of the employee's testimony?
Why did the Bureau find it necessary to substitute Order
53-7 for the prior Notice Rule?

The City complains that the absence of a key employee
due to a court appearance may cause a serious problem,
but Order 53-7 and the Memo are not needed or framed to
address this problem. The City can deny permission for an
employee to miss work for a voluntary court appearance

without reviewing and clearing the substance of the employee's testimony.

Turning to the City's argument that Order 53-7 and the McNeilly Memo serve to prevent the disclosure of confidential information, we certainly do not dispute the importance of this interest, cf. Snepp v. United States, 444 U.S. 507, 509 n.3 (1980), but we again conclude that the Order and Memo are ill-suited to serve this end. The Order and Memo do not simply permit the Bureau to prohibit an employee from giving testimony that would reveal confidential information but rather sweep much more broadly. Moreover, the fact that the Order and Memo do not apply at all to the purely factual statements "cast[s] serious doubt" on the submission that the threat of disclosure of confidential information was "perceived . . . as so threatening . . . as to render [the Order and Memo] a reasonable response to the threat." NTEU, 513 U.S. at 473. After all, there is no reason to suppose that there is greater risk that confidential facts will be revealed when an employee provides opinion testimony than when the employee appears as a fact witness.4 Finally, we note that Deputy Chief Moffat testified at the preliminary injunction hearing that before Order 53-7 was promulgated the Police Bureau's Standards of Conduct already prohibited an officer from revealing confidential information, and the City has not called to our attention any evidence in the record that this prohibition was insufficient to deal with the problem.

The City contends that the Order and Memo serve to provide advance notice of testimony that may cause civil disruption, and we can imagine some (albeit rare) circumstances in which opinion testimony by a Bureau employee could present such a threat.5  However, Order 53-

_____

4. Suppose, for example, that an officer was approached by a lawyer conducting litigation or was subpoenaed for the sole and express purpose of eliciting confidential factual information. Order 53-7 and the Memo would not apply.

5. Indeed, it is possible that the type of testimony that Officer Swartzwelder sought permission to give -- expert testimony in support of police officers charged with use of excessive force-- could under some circumstances lead to disturbances.

7 is by no means limited to testimony having such a potential. Instead, the Order covers all opinion testimony even though most presents no danger of disruption. In addition, the Order covers no factual testimony, although there are circumstances in which factual testimony could present such a threat. Furthermore, the Order and Memo do not simply require notice of the substance of opinion

testimony (which would suffice to alert the Bureau to be prepared); rather, the Order and Memo prohibit opinion testimony unless the Chief of Police approves it. And the standard for granting approval has nothing to do with the potential of the testimony to cause a disruption; rather, the test (if any is provided) appears to be whether the testimony is "valid."

The City argues that Order 53-7 prevents the appearance that officer testimony is "for sale," Appellants' Br. at 22, but the City has not offered any evidence that Bureau employees are being paid to testify. (Swartzwelder himself apparently was not.). Moreover, Order 53-7 and the McNeilly Memo do not address the issue of compensation for expert testimony. We would view this case very differently if Order 53-7 simply barred an employee of the Bureau from receiving a fee for providing expert testimony related to the employee's official duties, but that is not what Order 53-7 provides.

The City suggests that Order 53-7 and the McNeilly Memo prevent public confusion regarding the City's official policies and practices, and we agree that this is a legitimate and substantial objective. Officer Swartzwelder's situation is illustrative. With the Bureau's approval, Swartzwelder has testified in court as an expert regarding the proper use of force, and he has trained other officers. Under these circumstances, we understand the City's concern that, as long as Officer Swartzwelder remains with the Bureau, any expert testimony that he provides regarding another officer's use of force may be interpreted by segments of the public as an expression of the Bureau's official view. We similarly understand the Bureau's concerns about such a potential misunderstanding. The policies and practices of a police department concerning the use of force are important and sensitive topics, and misunderstanding about these

16

topics can severely undermine a department's ability to carry out its mission.

Nevertheless, Order 53-7 and the McNeilly Memo are not carefully crafted to serve this interest. The Order and Memo are not limited to testimony related to an employee's official duties. In addition, if the Order and Memo specify any standard for determining whether testimony will be approved, the standard is not closely tied to the impact of the testimony on the operations of the Bureau. The only standard mentioned in the Order or Memo is whether, in the judgment of an assistant city solicitor, the testimony is "valid." Both the nature of this standard and the official assigned the task of applying it are troubling.

As to the nature of the standard, the meaning of "valid[ity]" in this context is unclear, and the City has made no effort to clarify this concept. The City merely states that "to the extent that the regulation does not specifically articulate the precise circumstances in which officers may

or may not testify as experts, the City asserts that not only is more precise specificity not attainable in this context, but that the regulation as drafted was intended to be as neutral as possible." Appellants' Br. at 26.

We cannot agree with this argument. A more precise and focused test than "valid[ity]" is surely possible, and "valid[ity]" is so open-ended that it creates a danger of improper application. Outside the government-employment context, regulations requiring approval prior to engaging in expression have been required for decades to include "narrowly drawn, reasonable and definite standards." Niemotko v. Maryland, 340 U.S. 268, 271 (1951). See also, e.g., Thomas v. Chicago Park District, 122 S. Ct. 775, 780 (2002); City of Lakewood v. Plain Dealers Pub. Co., 486 U.S. 750, 757 (1988). Without suggesting that government employment regulations demand the same degree of precision as regulations governing other speech, we nevertheless regard the open-ended standard of "valid[ity]" as disturbing. And as for the person assigned the task of applying this standard -- at least in the first instance[6] --

_____

6. Although the McNeilly Memo states that an assistant city solicitor must review proposed testimony for validity, Order 53-7 says that the

an assistant city solicitor seems to be in a poor position to perform the balancing called for by Connick, which includes an assessment of the impact of the testimony on the Bureau.

The City maintains that the Order and Memo guard against testimony that would impair an employee's ability to continue to work harmoniously with colleagues in the Bureau. But if this is the City's concern, it is not easy to see why factual testimony is not covered. Factual testimony is no less likely to cause friction with colleagues than is opinion testimony. In any event, the City's speculative concern does not warrant the broad, prior restraint set forth in the Order and Memo.

Finally, we consider whether it is likely that Order 53-7 and the McNeilly Memo can be sustained on the ground that they serve to prevent a Bureau employee from giving opinion testimony that would impair the employee's ability to perform his or her job in some other way. This could occur if an employee who regularly testifies as an expert on behalf of the City or the Commonwealth gave opinion testimony that sharply conflicted with the opinions that the employee customarily provided on behalf of the City or Commonwealth. (Suppose that a ballistics expert testified that in his opinion ballistics evidence is worthless.) We recognize the legitimacy of this concern, but again see insufficient support in the record at this juncture to convince us that the plaintiff 's First Amendment claim is not likely to succeed. First, an employee who sincerely holds an opinion that is antithetical to the job that the

Bureau expects the employee to perform often could not continue to function effectively in that job irrespective of

_____

approval to testify must be provided by the Chief of Police. It is conceivable that the Memo was meant as a delegation of authority from the Chief to an assistant city solicitor, but in the Charmo case, Swartzwelder was advised by the Law Department that the Chief would still have to approve his request to testify. This suggests that the ultimate authority still resides with the Chief, and if this is so, it is entirely unclear what standard the Chief is to apply. It is possible that he too is supposed to determine whether the proposed testimony is "valid," but it is also possible that the Chief 's discretion is entirely unbounded.

whether the employee is allowed to express that opinion in court on behalf of a private party. Second, the City has not attempted to show that this problem arises with enough frequency to justify the Order's breadth. Third, the testimony in question, even if seriously inconvenient to the employer, might be protected under Connick if it is sufficiently valuable. And in cases of this nature-- where there are heavy weights on both sides of the scale-- the balancing process can be performed more satisfactorily after the speech has occurred, when both its usefulness and its impact can be more accurately assessed.

There is no question that the effective functioning of a government office may be undermined by employee testimony on matters relating to the office. For this reason, some federal, state, and local government units have adopted rules that require employees to give notice of or obtain approval for testimony in advance. Some have been sustained against First Amendment challenges, see, e.g., Weaver, 87 F.3d at 1443, and we do not in this opinion express an opinion about any rules of this nature other than those that are before us in this case. And the question before us here is not even whether Order 53-7 and the McNeilly Memo can ultimately be sustained, but only whether the District Court abused its discretion in holding that the plaintiff was likely to succeed in challenging them. On the record before us, we hold that the District Court did not abuse its discretion in making that determination.

IV.

We now address the City's argument that the plaintiff failed to satisfy the other requirements for obtaining preliminary injunctive relief.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998). We sustain the holding that Swartzwelder is likely to succeed in showing that the Order and Memo are unconstitutional, and in view of his demonstrated proclivity to offer expert

testimony, we hold that the District Court did not err in

concluding that Swartzwelder faced the prospect of
irreparable injury.

We also hold that the District Court did not err in
concluding that the balance of hardships weighs in
Swartzwelder's favor. While the preliminary injunction may
impinge on significant interests of the City, the preliminary
injunction leaves the City free to attempt to draft new
regulations that are better tailored to serve those interests.
On the other hand, if the preliminary injunction had been
denied, Swartzwelder and those who might have benefitted
from his testimony would have suffered an important loss.

As for the final factor, the public interest is best served
by eliminating the unconstitutional restrictions imposed by
Order 53-7 and the McNeilly Memo while at the same time
permitting the City to attempt, if it wishes, to frame a more
tailored regulation that serves its legitimate interests.

V.

For the reasons stated above, we affirm the preliminary
injunction, as previously interpreted.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit