**ALLEGHENY COUNTY PRISON EMPLOYEES INDEPENDENT UNION, and Charles Manderino, individually and on behalf of the Members of ACPEIU, Plaintiff,**

v.

**COUNTY OF ALLEGHENY, Calvin A. Lightfoot, Warden and Allegheny County Jail, Defendant.**

Civil Action 03–1075.

United States District Court, W.D. Pennsylvania.

Feb. 4, 2004.

Bryan Campbell, Pittsburgh, PA, for plaintiff.

Robert L. McTiernan, Charles P. McCullough, Allegheny County Law Department, Pittsburgh, PA, for defendant.

## MEMORANDUM ORDER

CONTI, District Judge.

Pending before this court is a motion for preliminary injunction filed by plaintiffs Allegheny County Prison Employees Independent Union (the "Union") and Charles Manderino ("Manderino" and together with the Union collectively referred to as "plaintiffs") filed pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs request a preliminary injunction: (1) to enjoin defendants County of Allegheny (the "County"), Calvin A. Lightfoot (the "Warden"), and Allegheny County Jail (the "jail" and together with the County and the Warden collectively referred to as "defendants") from searching Manderino and other prison guards who are members of the Union in accordance with the policies promulgated by the Warden and (2) to prevent any disciplinary proceedings against members of the Union who refused to be searched in accordance with the jail's policies. The second request for relief is moot in light of the significant revisions to the challenged policies and the court's prior order which precluded disciplinary action from being taken for violation of the prior versions of the policies. The only issue remaining is whether the enforcement of the current search policies shall be enjoined. Plaintiffs assert that the court should enter the preliminary injunction because searches performed in accordance with the policies promulgated by the Warden violate the Fourth and Fourteenth Amendments of the Constitution. Specifically, plaintiffs allege that the searches are an unreasonable invasion of the Union members' rights and that the Union members are treated differently than other persons entering the jail. In response, defendants argue that searches are constitutional because plaintiffs have a lesser expectation of privacy when they are entering the jail and defendants have a legitimate, rational reason for the manner in which they conduct their searches.

After consideration of the parties' submissions, oral argument and evidence pre-

sented, the court denies plaintiffs' motion for the entry of a preliminary injunction to enjoin searches under the policies in effect on the date of this order as' promulgated by the Warden. The court does not find that plaintiffs are likely to succeed on the merits of their claims that the applicable search policies violate the Fourth and Fourteenth Amendments. Moreover, the court finds that in balancing the potential irreparable harm to the plaintiffs, the potential irreparable harm to the defendants, and the public interest, the balance weighs in favor of denying the preliminary injunction.

### Procedural History

On July 16, 2003, plaintiffs filed a complaint and motion for a temporary restraining order and preliminary injunction. The following day, on July 17, 2003, the court held a hearing with regard to plaintiffs' temporary restraining order. That same day, after hearing evidence, the court granted plaintiffs' request for a temporary restraining order in part and denied it in part. Specifically, the court ordered on the record, *inter alia*, that non-intrusive patdown searches on a random, lottery basis that included removing shoes and belts, but not socks, were permissible and precluded disciplinary action from being taken for violations of the challenged policies.

On August 1, 2003, the parties requested and received oral clarification of the court's July 17, 2003 order. On August 22, 2003, the Warden revised the challenged policies. On October 2, 2003, plaintiffs filed a motion to amend their complaint to address the revised policies. Additionally,

in plaintiffs' amended complaint, plaintiffs allege a violation of equal protection and claim that the revised policies employ a method of selecting persons for searches that is not constitutional. On October 6, 2003, the court granted plaintiffs' motion to amend their complaint.

On October 28, 2003, the court held a hearing with regard to plaintiffs' request for a preliminary injunction. Seven witnesses testified and the testimony of four witnesses who testified at the hearing on the temporary restraining order was incorporated by reference. The transcript from the October 28, 2003 hearing was ordered and the parties' request to file supplemental briefs regarding the issues raised during the preliminary injunction hearing was granted.

### Background of Allegheny County Jail's policies with respect to randomly searching employees

The current search policies are set forth in Administrative Directive # 54 dated August 22, 2003 ("Ad. Dir. # 54, as revised"). The prior versions of those policies were set forth in Administrative Directive # 54, respectively dated May 15, 1997 and July 11, 2003. The version dated July 11, 2003, which was enforced on approximately July 11, 2003, emerged shortly after the Warden was searched pursuant to the May 15, 1997 version of the policy and was not asked to remove his socks. (7/17/03 Tr. at 55–57.) The current version dated August 22, 2003 was implemented around that date, and it replaced the July 11, 2003 version.[1] The descriptions of the prior versions of Administrative Directive # 54

---

1. Almost identical to Ad. Dir. # 54, as revised, are Administrative Directive # 79 dated September 29, 2003 and Administrative Directive # 80 dated October 17, 2003. Those directives respectively detail the jail's policies with respect to searching persons entering the

main lobby of the jail and the intake, pre-arraignment area. While plaintiffs are not challenging Administrative Directives # 79 and # 80, those policies are relevant to plaintiffs' equal protection claims.

are helpful because they influenced the current version at issue.

The May 15, 1997 version of the policy required all employees entering through the employee entrance of the Allegheny County Jail to be searched for contraband. (Pls.' Compl. Ex. 1.) The procedure required the Shift Commander to determine a random number pattern, e.g. every third person or every fifth person, before a shift begins and to record the number pattern, which should vary, in a search log prior to commencing the searches. *Id.* As employees walked out of the elevator, the Shift Commander counted each person and directed employees pursuant to the number pattern to be searched. *Id.*

The May 15, 1997 version further provided that the search was to take place in a separate room and required employees to empty all items from their pockets, remove their shoes, and be subject to pat search, with females searching females and males searching males. *Id.* It also stated that a correctional officer will be present to observe the searches, and the staff member conducting the search was to retain a search log with the date and signatures of the persons searched. *Id.* Additionally, that version provided that any employees found to have contraband on their person or who refuse to be searched will not be permitted to report for duty and will be subject to appropriate action. *Id.*

While the parties agree that the May 15, 1997 procedures had been in effect for some time, they dispute the kind of patdown search to which employees were subject between May 15, 1997 and July 9, 2003. (7/17/03 Tr. at 64, 99–103.) Specifically, plaintiffs assert that not all employees subject to random searches prior to July 9, 2003 were required to remove their shoes or were subject to a patdown with the same level of thoroughness. (7/17/03 Tr. at 26, 99–103.) Based upon the factual evidence submitted, the court finds that the persons conducting searches prior to July 9, 2003' did not consistently abide by the policies then in effect or conduct searches with the same degree of thoroughness that the Warden testified was inherent in those policies and that he was subjected to when he was searched in early July 2003.

The July 11, 2003 version of the policies is very similar to the May 15, 1997 version in terms of its substance. (*Compare* Pls.' Compl. Ex. 1 *and* Pls.' Compl. Ex. 2.) The main difference is that the July 11, 2003 version required employees to remove their socks and belts in addition to their shoes during the random searches of employees. (Pls.' Compl. Ex. 2.) The July 11, 2003 version also mandated that the random employee searches be videotaped. *Id.* It also specified that violations of the policies may result in disciplinary action up to and including termination. *Id.*

The version of Ad. Dir. # 54, as revised, dated August 22, 2003, which is in issue, revises and builds upon the prior versions and contains similar substance; however, it further details the patdown search procedures that are to be followed when conducting the random searches of employees. (*Compare* Pls.' Compl. Ex. 2 *and* Pls.' Am. Compl. Ex. 1.) Ad. Dir. # 54, as revised, unlike the July 11, 2003 version, does not require employees to remove socks-only shoes, belts and outer garments; however, staff members performing the searches are to patdown thoroughly the outside of employees' clothes, ensuring that no contraband is hidden on the employee's person. The patdown includes a searcher running his or her hands (a male searcher for a male and a female searcher for a female) down the front of the employee, examining the em-

ployee's waistband, and patting the area of the employee's lower abdomen, and the groin area. (Pls.' Am. Compl. Ex. 1.) Additionally, the applicable search policy requires that employees remove all outer garments such as hat, coat or gloves and empty all items from their pockets prior to the search. *Id.* It also warns staff members performing searches to be "watchful" of "toupees, eyeglasses, watches, and medical alert bracelets, all of which can conceal contraband." *Id.* The applicable search policy also states that the searches are to be done in a respectful, non-offensive way and should not involve any kind of groping or massaging. *Id.*

The search procedures in issue—Ad. Dir. # 54, as revised,—are consistent with the type of patdown search that correctional officers and police officers are trained to perform when they are searching to ensure that a person is not carrying contraband. (7/17/03 Tr. at 94–95.) The outer-clothing patdown search procedures for employees are used on inmates and suspects incident to arrest. (7/17/03 Tr. at 94–95.) In fact, in order to be effective in locating contraband, an outer-clothing patdown search would have to be consistent with the one contained in Ad. Dir. # 54, as revised. (10/28/03 Tr. at 34, 50, 78.) For example, if only a limited or general search were required and the search that did not cover an employee's entire body, it would not be effective because the employee would know in advance where he or she could hide contraband without it being detected. (7/17/03 Tr. at 59, 10/28/03 Tr. at 16–18.)

As noted Ad. Dir. # 54, as revised, sets forth the only policies that plaintiffs are currently challenging as violating their rights.

## *Findings of Fact*

### I. Purpose of Searches.

The parties agree that it is important to keep contraband out of the Allegheny County Jail. (7/17/03 Tr. at 22.) Contraband, which encompasses a wide category of items, includes: (1) any potential weapons—the most common being guns, knives, and sharp objects that can do bodily harm, (2) any illegal drugs—namely, heroin, cocaine, marijuana, (3) any tobacco products, (4) any food products not allowed in the jail, and (5) miscellaneous items that are not allowed, such as handcuff keys and certain reading materials. (7/17/03 Tr. at 46 47.) The ways in which contraband affects inmates can vary from inmates obtaining marijuana and acting out to inmates becoming violent and trying to escape. (7/17/03 Tr. at 49–50.) Contraband that had been smuggled into the jail included marijuana, a handcuff key and tobacco products. (7/17/03 Tr. at 49–50, 72.)

While the vast majority of employees do not bring contraband into the jail, conducting random, thorough searches of employees helps the prison administration reduce the chances of a rogue employee smuggling contraband into the jail. (7/17/03 Tr. at 48–49, 58, 75, 90.) The court finds that conducting random searches to prevent contraband, in particular weapons and drugs, from entering the Allegheny County Jail is extremely important not only for penological, but also for safety reasons. If stringent security measures are not implemented, significant potential for harm exists. (7/17/03 Tr. at 49, 58–59, 62.)

### II. Discipline.

Between approximately May of 1997 and July of 2003, Manderino estimated that he was searched approximately forty (40) times. He did not object to those searches and he did not object to the method of selecting persons to be searched—he felt it

was random. (7/17/03 Tr. at 8, 21–22, 99.) In those forty random employee searches, Manderino testified that he had never been asked to remove his shoes and that the patdown never included a search into the groin area. (7/17/03 Tr. at 99.)

On or about July 9, 2003, Manderino was subject to a random employee search in which he was asked to remove his shoes. He, however, refused to remove his shoes, based upon his belief that it was invasive and violated his rights. (7/17/03 Tr. at 11, 22, 25, 99.) Manderino viewed the removal of certain kinds of garments or clothing items, such as shoes, socks, or belts, as constituting a partial strip search. (7/17/03 Tr. at 35.)

Between July 9, 2003 and July 17, 2003, there were approximately fourteen (14) additional correctional officers, all members of the Union, who refused to comply with orders to remove shoes, socks and belts that were made during the random employee searches. (7/17/03 Tr. at 16.) When these employees, including Manderino, refused to comply with orders from the prison administration, they were sent home and disciplined with five-day suspensions. (7/17/03 Tr. at 14, 16.) The employees found the five-day suspensions to be particularly troublesome because the next step in the progressive discipline policy is termination. (7/17/03 Tr. at 12–14.) Additionally, Manderino noted that his five-day suspension was the first disciplinary action that he had received during his fifteen years of employment by the jail. (7/17/03 Tr. at 12–13.) The court ordered that disciplinary action not be implemented for those searches. (7/17/03 Tr. at 130, 135.)

### III. Random Searches.

There are two main entrances to the Allegheny County Jail—the employee entrance and the visitors entrance. (7/17/03

Tr. at 7.) The intake area and the loading docks are the only other entrance areas into the jail. *Id.* The loading dock area is strictly for deliveries and no one enters the jail through that area. *Id.*

### A. The Employee Entrance

Approximately 1,000 people, who are mainly employees and independent contractors, enter the jail through the employee entrance on a daily basis. (7/17/03 Tr. at 44–45, 60.) About 570 of them are uniformed officers or persons with direct supervisory responsibility over the approximately 2,400 inmates. (7/17/03 Tr. at 43–44.) These 570 persons include management, such as the Warden and the deputy wardens, as well as all levels of correction officers. (7/17/03 Tr. at 43.) The other individuals who use the employee entrance are independent contractors (i.e. food service, medical, and laundry workers), employees from agencies that collaborate with the jail (such as the Health Department and Human Services Department), maintenance staff, case workers, teachers and volunteers. (7/17/03 Tr. at 44, 10/28/03 Tr. at 104.)

Even before workers are counted in accordance with random search procedures at the employee entrance, workers pass by two monitors that are x-ray machines and a metal detector located on the ground floor of the employee entrance. (7/17/03 Tr. at 8.) After the workers pass through the metal detector, they step onto the elevator, which takes them to Level 1M. *Id.* As they step off the elevator onto Level 1M, the workers are counted by a staff member and on a random basis are searched. *Id.*

In addition to the staff member counting the workers, there is a staff witness to ensure that the counting is occurring in accordance with the predetermined number. (10/28/03 Tr. at 104–106.) At the

Union's request, there is now a representative from the Union, who witnesses the counting procedure. In addition to the two witnesses observing the counting procedure, there are two witnesses present, one from jail and one from the Union, during the search. *Id.* Following each search, the workers who were searched sign the log book located in the employee search room. (10/28/03 Tr. at 111–114.)

Everyone who enters the jail through the employee entrance is subject to the same random search procedures to ensure that contraband is not entering the jail. (10/28/03 Tr. at 104.) As of August 22, 2003, the specific search procedures being enforced are the ones set forth in Ad. Dir. # 54, as revised, and the policies set forth in that directive are the only policies at issue for purposes of the motion for a preliminary injunction. (10/28/03 Tr. at 61–65.)

## B. Visitors Entrance (Second Avenue Main Lobby Entrance)

The number of individuals who pass through the visitors entrance varies, but it is estimated that between 100 to 200 persons go through the visitors entrance during the 3:00 p.m. to 11:00 p.m. shift. (10/28/03 Tr. at 46–47.) Most of the people who enter the jail through the visitors entrance are family members or friends of the inmates or attorneys who are at the jail to visit with individual inmates. (10/28/03 Tr. at 47.) Most of the visitors and attorneys do not enter the general population areas of the jail. (10/28/03 Tr. at 81.) The inmates' loved ones and attorneys usually have non-contact visits where they speak to the inmates over a telephone because they are separated by a glass barrier, which prevents them from having any contact. (7/17/03 Tr. at 77–78, 10/28/03 Tr. at 47.)

The procedures for non-contact visits require the visitors to: (1) lock all their belongings in a locker, (2) enter through a metal detector, (3) only carry their visitor passes and the keys to their lockers and (4) remain in the restricted area where they are separated from the inmates that they are visiting. (7/17/03 Tr. at 76–78, 10/28/03 Tr. at 79–81.) Non-contact visitors are not subject to random searches because they do not have any contact with the inmates and do not go into the general population areas. (7/17/03 Tr. at 77–78, 10/28/03 Tr. at 117.)

The visitors entrance is also used by persons who have contact visits. (10/28/03 Tr. at 48.) Those persons include religious advisors, clergy, counselors, and program advisors, all of whom enter the general population areas of the jail or have direct contact with inmates. (10/28/03 Tr. at 42, 81, 117.) Additionally, there are persons, such as attorneys and some inmates' loved ones, who are permitted to have contact visits with inmates. (10/28/03 Tr. at 80–81.) All of the people entering through the visitors entrance who either go into the general population areas or have contact with inmates are subject to random searches. (10/28/03 Tr. at 81–82, 117–118.)

Like the non-contact visitors, the contact visitors are required to place all personal belongings in a locker, go through a metal detector, and place any belongings that they are bringing into the jail (i.e. attorney's brief case or religious advisor's Bible) through an x-ray machine. (10/28/03 Tr. at 81, 119.) They, however, also may be subject to the random searches, which are conducted in the same manner as the random searches of the workers who enter the employee entrance. (10/28/03 Tr. at 82, 118.) These random searches are to be consistent with Administrative Directive # 79 that was implemented on or about September 29, 2003. (10/28/03 Tr. at 117–

118.) Unlike at the employee entrance where a new random search pattern begins at the start of each shift, there are not set times when the search pattern will begin at the visitors entrance. (10/28/03 Tr. at 48–50, 81, 117.) Rather, the supervisor on that floor or the shift commander will call the officer working at the visitors entrance and designate when, what time, and what number person will be selected for the random searches. (10/28/03 Tr. at 44, 48–50, 81.) Additionally, inmates are subject to strip-searches after they have contact visits. (7/17/03 Tr. at 88.)

## C. Intake Area

In addition to the employee entrance and the visitor entrance, there is an entrance at the intake area, which is on the ground level of the jail. (10/28/03 Tr. at 82.) The intake area is divided into the records room, the intake sallyport, the processing area, and the pre-arraignment area. (10/28/03 Tr. at 82–83.) The only persons who are permitted to enter the intake area—besides inmates who are all searched—are: (1) law enforcement officers, (2) city identification employees, (3) bail agent investigators, and (4) forensics personnel. (10/28/03 Tr. at 83–86.) Of these individuals, only law enforcement persons, i.e., from the F.B.I., U.S. Marshals, constables, city police, county police, etc., are not searched. (10/28/03 Tr. at 86.) They are not searched because they do not enter the general population areas of the jail, and are only in the restricted sallyport area of the jail where they sign-in inmates. (10/28/03 Tr. at 83–84.) Searching the law enforcement officers would also hold-up processing of the inmates. (10/28/03 Tr. at 123.) The only inmates that the law enforcement agents have contact with are the ones that they have transported to the jail and those inmates are thoroughly searched before entering the general population. (10/28/03 Tr. at 123, 125–126).

Except for the law enforcement officers, all of the categories of persons who enter the jail at the intake area may have contact with inmates and actually go into the general population areas. (10/28/03 Tr. at 84–85.) For example, the forensic people are generally checking the mental health history of an inmate and may have to have some type of contact with an inmate. (10/28/03 Tr. at 85.) Because of the potential for contact with inmates, those categories of persons are subject to random searches. (10/28/03 Tr. at 84–85.) These random searches take place in the same way as the employee random searches at the employee entrance, and they are conducted in a manner that is to be consistent with Administrative Directive #80, adopted on about September 29, 2003. (10/28/03 Tr. at 122–123.)

### *Standard of Review*

 In determining whether to grant a preliminary injunction, the court is to consider the following four factors: (1) whether the movant has demonstrated a reasonable likelihood of success on the merits; (2) whether the movant will be irreparably harmed by the denial of injunctive relief; (3) whether the injunctive relief sought will result in greater harm to the non-movant; and (4) whether the injunctive relief sought is in the public interest. *Shire U.S. Inc. v. Barr Laboratories, Inc.*, 329 F.3d 348, 352 (3d Cir.2003); *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir.2002); *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999).

 It is well-established that district courts are to engage in a balancing test to determine whether there is an overall need for a preliminary injunction. *See Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975) (stating that while the moving party generally must make a showing with regard to the first two prongs, the court is to weigh

all relevant facts with regard to the four factors). Additionally, when performing the balancing test, district courts are to keep in mind that "preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *In re Microsoft Corp. Antitrust Litigation,* 333 F.3d 517, 524 (4th Cir.2003) (internal quotations and citations omitted).

### *Discussion*

■ Plaintiffs allege in their amended complaint that the defendants' random search policies as set forth in Ad. Dir. # 54, as revised, violate the Fourth Amendment's protection from unreasonable searches as applied to the states through the Fourteenth Amendment and violate the Equal Protection Clause contained within the Fourteenth Amendment. The court must determine whether a preliminary injunction is warranted based upon these allegations.

### A. Likelihood of Success on the Merits

■ To find that plaintiffs are likely to prevail on the merits: "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a[p]rima facie case showing a *reasonable probability* that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d at 148 (emphasis added). Here, plaintiffs have not made a prima facie case that there is a reasonable probability that they will prevail on the merits of their two claims.

### 1. Are the Random Employee Searches Unreasonable?

■ In relevant part, the Fourth Amendment protects "[t]he right of people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. As a result, to be constitutional, a search must be reasonable. *Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). In determining reasonableness, the United States Supreme Court requires a court to balance *the invasion of the personal rights that the search entailed* against *the need for the particular search. Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). This balancing further requires the court to analyze "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

### (A) Invasion of the Personal Rights that the Searches Entail

■ In terms of the invasion of personal rights, the intrusion is to be viewed in the context of plaintiffs' legitimate expectation of privacy—both their actual, subjective expectation of privacy and the expectation that society is prepared to recognize as reasonable. *See Security and Law Enforcement Employees v. Carey,* 737 F.2d 187, 201 (2d Cir.1984) (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). In cases involving employees of incarceration facilities, courts have observed that these employees have diminished expectations of privacy while they are within the confines of the jail. *See McDonell v. Hunter,* 809 F.2d 1302, 1306 (8th Cir.1987) (stating that "based on [correctional officers'] place of employment, their subjective expectations of privacy are diminished while they are in the confines of the prison"). Additionally, the United States Court of Appeals for the Second Circuit stated that "society is prepared to recognize as reasonable, the proposition that correction officers have dimin-

ished expectations of privacy in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons." *Carey,* 737 F.2d at 202.

■ As correctional officers working in the Allegheny County Jail, plaintiffs' subjective expectations of their privacy rights are diminished. *See id.* For example, Manderino testified about the need to prevent contraband from entering the jail. (7/17/03 Tr. at 21–22.) Manderino further testified that the Union never objected to the correctional officers having to go through metal detector and random searches per se-it was the "disrobing" to which plaintiffs object. (7/17/03 Tr. at 22.) Additionally, there was testimony about the background checks to which the correctional officers are subjected, the internal affairs department that has the authority to investigate employees, and the hidden cameras in the jail. (10/28/03 Tr. at 57–59.) Thus, plaintiffs are aware that they have diminished expectations of privacy because they work in a jail that requires the implementation of extreme security measures.

■ While plaintiffs' expectations of privacy are diminished, this does not mean they can be subjected to excessive and unwarranted intrusions based upon whatever the prison administration decides. *See Carey,* 737 F.2d at 202. It does, however, mean that plaintiffs may be treated similar to individuals crossing the borders of the United States of America because both correctional officers and persons crossing boarders into this country have diminished expectations of privacy. *Id.* at 204.

### (B) Need for the Particular Searches

■ Both parties acknowledged the need for a secure jail. The Warden testified at great length about the potential for serious security dangers if contraband, particularly drugs and weapons, enter the Allegheny County Jail. The court recognizes the complex and challenging security problems faced by the prison administration and the legitimate penological imperatives of maintaining prison security. *See Bell,* 441 U.S. at 559, 99 S.Ct. 1861 (noting that correctional facilities are "fraught with serious security dangers"); *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (observing the great importance of internal security in prisons). Specifically, the court finds that the government has an important interest "in controlling the flow of contraband into correctional facilities" and that this interest is similar to the important governmental interest in controlling the flow of contraband into this country. *Carey,* 737 F.2d at 204.

### (C) The Reasonableness Balance Struck in *Bradley*

In *Bradley v. United States,* the United States Court of Appeals for the Third Circuit held that a border search involving an "intrusive patdown" was a routine border search and did ***not*** require reasonable suspicion under the Fourth Amendment. 299 F.3d 197, 205 (3d Cir.2002) ("custom officials as a matter of standard procedure are permitted to feel over clothing for bulges in an area know by them as a common place for hiding contraband"). In *Bradley* the patdown involved an inspector of the same sex conducting a patdown on the outside of Bradley's dress, and during the patdown, the female inspector used her fingers to push on Bradley's breasts and into Bradley's inner and outer labia. *Id.* at 201. In finding this type of patdown search to be routine, the court distinguished patdown searches, which include patting the outside of sensitive areas, from non-routine searches that would require

some level of suspicion, such as strip searches, body cavity searches and pat-downs that go awry (ones involving fondling or penetration). *Id.* at 203–205.

Initially, plaintiffs argued that *Bradley* supported their position; however, plaintiffs now contend that it is distinguishable primarily because border searches are fundamentally different from searches of correctional officers. Specifically, plaintiffs point out factual distinctions, such as Bradley not being known to the customs agents, and the flight she arrived on being viewed as a "high risk for narcotics." The court finds plaintiffs' arguments unpersuasive in light of the United States Court of Appeals for the Second Circuit's analysis of the similarities between searches performed at this country's boarders and searches of correctional officers. *Carey,* 737 F.2d at 204. Notably, the two primary factors in determining reasonableness of a search—the invasion of personal rights based upon privacy expectations and the importance of the governmental interest—were found to be similar in the case of correctional officers and persons crossing the Unites States' borders. *Id.*

Here, plaintiffs argue that the employee search procedures detailed in Ad. Dir. # 54, as revised, are unreasonable because they require plaintiffs to remove their shoes and belts. Contrary to plaintiffs' argument, the court does not find removal of shoes and belts to constitute a strip search or even a partial strip search. Under federal law, a strip search means the exposure of a person's naked body for the purpose of a visual or physical examination. *Amaechi v. West,* 237 F.3d 356, 363 (4th Cir.2001) (internal citations omitted). Here, the removal of shoes and belts is for the purpose of examining the shoes and belts and does not require plaintiffs to expose their "naked body." Moreover, the court notes that these same require-ments—removal of shoes and belts—are regularly and routinely imposed upon persons entering airport terminals to travel on both domestic and international flights.

Plaintiffs also argue that the random employee searches are unconstitutional because they involve "intrusions into the groin, buttocks or breasts." Based upon the holding and reasoning of *Bradley,* the court finds it would be very unlikely that plaintiffs would succeed on the merits of this claim. This is because routine pat-down searches that occur over clothing, when they occur at this country's borders or when they occur in connection with a jail's security procedures, do not require reasonable suspicion. Furthermore, based upon the evidence presented, plaintiffs did not show a reasonable probability that the searches or policies of defendants went beyond the scope of what were described as "routine patdown searches" for contraband in *Bradley.*

### 2. Is the Equal Protection Clause Violated?

 In a claim for violation of equal protection, there are two tests. *See Price v. Cohen,* 715 F.2d 87, 92 (3d Cir.1983). Under the traditional test, there is only a violation of the Equal Protection Clause if the treatment is not rationally related to a legitimate state interest. *Id.* If the differential treatment involves a protected classification, such as race, or infringement of a fundamental right, such as the right to travel, the government must have a compelling reason for the differential treatment. *Id.* Here, plaintiffs do not argue and the court does not find that plaintiffs are members of a suspect class or that defendants are infringing upon a fundamental right. Therefore, the traditional rational basis test applies.

The only differential treatment evident from the record is that persons entering

the jail who do not have contact with inmates or who do not enter the general population areas of the jail are treated differently than persons who enter the general population areas of the jail. Defendants argue and this court finds that this differential treatment is rationally related to the government's legitimate interest in controlling the flow of contraband into the jail. Therefore, this court finds it highly unlikely that plaintiffs will succeed on the merits of this claim.

## B. Irreparable Harm to the Moving Party

Irreparable harm means that the moving party will be injured in such a way that adequate compensatory or other corrective relief will not be available at a later date in the ordinary course of litigation. *Oburn v. Shapp*, 521 F.2d at 151. Here, because plaintiffs allege that they are being subject to unconstitutional searches, this case involves the type of injury that could result in irreparable harm. *See Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992) (finding irreparable harm may result when the right to be free from unreasonable searches is implicated). The court, however, notes that because of its finding with regard to likeliness of plaintiffs' success on the merits, this factor does not weigh as heavily in plaintiffs' favor as it otherwise would.

## C. Irreparable Harm to the Non-moving Party

The Warden testified with regard to the type of harm that could occur if the court were to grant plaintiffs' request for a preliminary injunction. The Warden's primary concern was that once workers knew that certain areas of their person would not be searched, i.e., they would not have to remove their shoes or belts or the groin area would not be patted, the jail's ability to control contraband from entering the jail would be severely injured. Because of the importance of controlling contraband for safety and security reasons, the court finds that limiting defendants' ability to control contraband from entering the jail could cause severe irreparable harm.

## D. Public Interest

Plaintiffs assert that the public interest prong favors entering a preliminary injunction because it will relieve tension between plaintiffs and defendants, cause an increase in morale, and thereby promote the efficient running of the jail. In contrast, defendants emphasize the potential risk to the public as well as those who live and work in the jail if defendants are limited in the thoroughness of the kind of patdown search that they can perform. Based upon the evidence, the court is persuaded by defendants' argument. While undoubtedly it is incumbent upon the parties to have harmonious, professional relationships, the court finds that the most crucial public interest implicated is the safety and security of the jail, and that it is reasonable in the context of an entrance into a jail by employees and others who will have contact visits with inmates for the prison administration to require searches which include, among other things, the removal of outer garments, shoes and belts, but not socks, and patdowns over the abdomen and groin area that do not involve groping or massaging.

### *Conclusion*

**AND NOW,** this fourth day of February 2004, after consideration of the evidence, oral arguments, and the parties' submissions, **IT IS ORDERED** that the motion for preliminary injunction filed by plaintiffs (Docket No. 2) is DENIED.