**F I L E D**

**PUBLISH**

**June 29, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROSEWOOD SERVICES, INC.;
TAMMY HAMMOND,

       Plaintiffs - Appellees,

  v.

SUNFLOWER DIVERSIFIED
SERVICES, INC., also known as
Central Kansas Developmental
Disabilities Organization; JAMES
JOHNSON,

      Defendants - Appellants.

No. 03-3288

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D. Ct. No. 02-CV-2140-JWL)**

---

Teresa L. Sittenauer (J. Steven Pigg, on the briefs), Fisher, Patterson, Sayler &
Smith, L.L.P., Topeka, Kansas, appearing for Appellants.

Dan Biles, Gates, Biles, Shields & Ryan, P.A., Overland Park, Kansas, appearing
for Appellees.

---

Before **TACHA**, Chief Circuit Judge, **HENRY**, and **HARTZ**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

Plaintiffs-Appellees Rosewood Services, Inc. ("Rosewood") and Tammy Hammond, Rosewood's sole shareholder, brought suit under 42 U.S.C. § 1983, alleging violations of constitutional rights guaranteed by the First and Fourteenth Amendments. Defendants-Appellants Sunflower Diversified Services, Inc. ("Sunflower"), a private non-profit corporation, and James Johnson, Sunflower's President, moved for summary judgment arguing that qualified immunity precludes this suit. The District Court held that the Defendants are not entitled to assert qualified immunity because they are non-governmental officials subject to the constraints of market forces. *See Richardson v. McKnight*, 521 U.S. 399 (1997). The Defendants bring an interlocutory appeal of the District Court's denial of qualified immunity.[1] We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

In 1995, the Kansas legislature reformed the way the state distributes funds to developmental disability service providers. *See* Developmental Disabilities Reform Act of 1995, Kan. Stat. Ann. § 39-1801 *et seq.* Under the provisions of

---

[1] The Defendants also argue that we should grant them qualified immunity once we determine that they are entitled to assert it. Because we conclude that these Defendants are not entitled to assert qualified immunity, we need not consider whether qualified immunity would be proper with respect to the claims brought by the Plaintiffs.

the Act, the state's Department of Social and Rehabilitation Services ("SRS") distributes state and federal funds for providing services to the developmentally disabled to community developmental disability organizations ("CDDOs"). Kan. Stat. Ann. § 39-1804(e). These CDDOs, which are private, non-profit organizations, then distribute the funds to the community services providers, who directly assist the state's developmentally disabled residents.[2] Kan. Stat. Ann. § 39-1805.

When this case began, Sunflower served as both the CDDO and as a community service provider for five counties: Barton, Rice, Pawnee, Rush, and Stafford. In March 1996, Sunflower hired Ms. Hammond to be a case manager. As a case manager, she worked with many of the disabled residents of these counties. While working for Sunflower, Ms. Hammond was approached by parents and guardians of Sunflower's clients who apparently were dissatisfied with the service they were receiving. Ms. Hammond was asked if she would consider opening her own provider agency. In May 1998, Ms. Hammond quit her job at Sunflower and formed Rosewood. Soon after Ms. Hammond left

---

[2]Under the regulations implementing the Act, any existing "community mental retardation center" became recognized as a CDDO. Kan. Admin. Regs. § 30-64-10(a). Because under existing law the "community mental retardation centers" were created on a county-by-county basis, a county can have only one CDDO. *See* Kan. Stat. Ann. § 19-4001. A CDDO, however, may serve multiple counties. Furthermore, a county may have any number of community service providers, one of which can be the CDDO itself.

-3-

Sunflower, a number of Sunflower's clients switched to Rosewood.

Rosewood quickly became a serious competitor to Sunflower for providing services to the developmentally disabled. Because Sunflower was also the area's CDDO, it was in charge of overseeing the distribution of funds to both Rosewood and itself. This potential conflict-of-interest is the root of the problems between Rosewood and Sunflower that are the basis of this suit. Eventually, Ms. Hammond, in conjunction with a community group called the Alliance, began lobbying to require "independent CDDOs" (i.e., a CDDO that was not a service provider as well). This action apparently angered Mr. Johnson. Allegedly in retaliation, Mr. Johnson filed baseless complaints with SRS, Rosewood's licensing agency, and subjected Rosewood to rigorous review that other service providers did not undergo.

On March 29, 2002, Ms. Hammond and Rosewood filed this § 1983 suit against Sunflower and Mr. Johnson. The Defendants moved for summary judgment, arguing, inter alia, that they were entitled to qualified immunity. Because the Defendants are private parties, and not government officials, the District Court had to decide whether these Defendants could even assert qualified immunity before determining whether qualified immunity was appropriate based on the facts of this case.

The District Court concluded that a private corporation could never claim

qualified immunity, and thus the court only considered Mr. Johnson's qualified immunity argument in detail. The District Court noted that the "sole argument" made by the Defendants was "that public policy considerations warrant the extension of qualified immunity in this case." *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 2003 WL 22090897 at *23 n.7 (D. Kan. 2003) (unpublished). The District Court then considered the Defendants' arguments and held that under *Richardson v. McKnight*, 521 U.S. 399 (1997), public policy considerations did not warrant permitting Mr. Johnson to assert qualified immunity. The Defendants timely appealed the District Court's decision that neither Sunflower nor Mr. Johnson can claim qualified immunity. We address these arguments below.

## II. DISCUSSION

A.    Jurisdiction and Standard of Review

We have limited jurisdiction to hear interlocutory appeals of denials of qualified immunity. Our jurisdiction is limited to reviewing denials of summary judgment based on qualified immunity when we are "present[ed with] neat abstract issues of law." *Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997) (internal quotations omitted). We lack jurisdiction to review a denial of summary judgment based on qualified immunity if the claim on appeal is based on disputed facts. *See Johnson v. Jones*, 515 U.S. 304, 307 (1995).

-5-

Because the issues raised on appeal do not rely on disputed facts, we have jurisdiction to decide this appeal. Furthermore, the fact that the Defendants are private entities does not prevent us from hearing this interlocutory appeal. *See DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 717 (10th Cir. 1988) (holding "that private parties acting pursuant to contractual duties may bring interlocutory appeals from the denial of qualified immunity").[3]

Having determined that we have jurisdiction to hear this appeal, we now review de novo the District Court's determination that the Defendants cannot assert qualified immunity. *See Bisbee v. Bey*, 39 F.3d 1096, 1099–1100 (10th Cir. 1994).

B.     Qualified Immunity for a Private Corporation

The District Court held that "qualified immunity only potentially shields Mr. Johnson, not Sunflower, from liability in this case." *Rosewood Servs.*, 2003

---

[3]In holding that a private defendant can bring an interlocutory appeal when a district court determines that the defendant cannot assert qualified immunity, the Second Circuit left open the possibility that a court of appeals may only have jurisdiction to hear such appeals if the private defendant has a "colorable claim to qualified immunity." *Toussie v. Powell*, 323 F.3d 178, 182 (2d Cir. 2003). Thus, once it becomes well established that a particular private defendant cannot assert qualified immunity, that defendant cannot bring an interlocutory appeal of the district court's denial of immunity. This Court has never recognized such a limitation on a private party's right to an interlocutory appeal of a denial of qualified immunity. Because the Defendants in this case present a colorable claim to qualified immunity, we need not decide whether a private party's right to interlocutory appeal should be so limited.

-6-

WL 22090897 at *21. The court cited cases stating that qualified immunity protected "government officials" and reasoned that when applied to private defendants, qualified immunity must only apply to individuals and not corporations. *Id*. (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998)). The District Court's conclusion, however, is contrary to existing Circuit precedent.

In *DeVargas*, this Court stated that "[i]n the area of § 1983 immunities, the critical distinction is not between employer and individual defendants, but between defendants that are governmental bodies and other defendants." 844 F.2d at 723. We further observed that the reasons for extending qualified immunity beyond government officials "apply equally to all private defendants acting pursuant to contract, whether individuals or corporations." *Id*. Consequently, we held that "when private parties act pursuant to contractual duties and perform governmental functions, they can claim qualified immunity. That a private party defendant is a corporation should not change this result." *Id*.

Under *DeVargas*, then, the fact that Sunflower is a corporation does not preclude it from arguing that it is entitled to assert qualified immunity. We therefore hold that there is no bar against a private corporation claiming qualified immunity.

C.      Private Defendants' Ability to Assert Qualified Immunity

On appeal, the Defendants do not distinguish between Sunflower as a corporate entity and Mr. Johnson in his individual capacity in arguing that public policy concerns warrant permitting them to assert qualified immunity. As such, we consider the arguments for qualified immunity as applying to both Defendants. The Defendants provide two grounds to support the notion that they can assert qualified immunity: (1) Qualified immunity may be asserted because Sunflower is substantially overseen by SRS; and (2) Policy considerations warrant extending qualified immunity to them. These arguments must be addressed in light of the Supreme Court's most recent decision on whether private parties can assert qualified immunity, *Richardson v. McKnight*, 521 U.S. 399 (1997).

In *Richardson*, the Supreme Court held that prison guards at a private, for-profit prison could not assert qualified immunity. The Court held that a private individual is only entitled to qualified immunity if a claim of immunity is supported by historical practice or based on public policy considerations. *Id*. at 403–04. In discussing the policy considerations, the Court recognized three purposes served by qualified immunity. First, by reducing the threat of litigation, qualified immunity "protect[s] the public from unwarranted timidity on the part of public officials." *Id*. at 408. Second, qualified immunity helps "'to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" *Id*. (quoting *Wyatt v. Cole*, 504 U.S. 158, 167 (1992)). Third,

qualified immunity reduces the chance that lawsuits will distract officials from their governmental duties. *Id*. The Court determined that these considerations did not weigh in favor of permitting private prison guards to assert qualified immunity, and because there was no historical evidence that private prison guards were granted immunity, the *Richardson* Court refused to allow the defendants to claim qualified immunity. *Id*. at 412.

After concluding that the defendants could not claim qualified immunity, the Court narrowed the scope of its holding. *Id*. at 413. It noted that *Richardson* arose in the context where "a private firm, systematically organized to assume a major lengthy task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Id*. The Court then clarified that *Richardson* "does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Id*.

In light of this substantial-supervision caveat, the courts of appeals have allowed private individuals to assert qualified immunity when the defendants were closely supervised by the government. *See, e.g., Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000). Similarly here, the Defendants argue that they should be allowed to assert qualified immunity because they are closely supervised by

SRS.  Consequently, *Richardson* is distinguishable, the Defendants argue, and qualified immunity may be asserted.

This may be true.  CDDOs may be entitled to qualified immunity based on the oversight they receive from SRS.  This case, however, does not present an opportunity to decide this issue because the Defendants failed to raise this argument below.  Indeed, the District Court recognized the limited nature of *Richardson*'s holding, but noted that the Defendants in this case "do not attempt to explain how this case falls outside the realm of *Richardson*."  *Rosewood Servs*., 2003 WL 2209087 at *23 n.7.  Because this "substantial supervision" argument was not made below, it is waived on appeal.  *See Cummings v. Norton*, 393 F.3d 1186, 1190–91 (10th Cir. 2005).

Therefore, the Defendant's sole argument on appeal is that policy considerations warrant permitting them to assert qualified immunity.[4]  Although the *Richardson* Court listed three purposes served by qualified immunity, only the first—unwarranted timidity—is at issue in this case.  The Defendants do not argue that the second purpose—ensuring that talented candidates are not deterred from seeking such employment—is applicable in this case.  And we need not consider

---

[4]Although *Richardson* also holds that private defendants can assert qualified immunity if such a claim is supported by historical practice, the Defendants concede that there is no historical support for their claim of immunity.

the third purpose—the distractive effect of litigation—because the *Richardson* Court expressly held that "the risk of 'distraction' alone cannot be sufficient grounds for an immunity." 521 U.S. at 411. We thus limit our review to whether extending qualified immunity to these Defendants is necessary to avoid unwarranted timidity in the performance of their duties.

In *Richardson*, the Supreme Court noted that unwarranted timidity, which it called "the most important special government immunity-producing concern[,] . . . is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison." *Id*. at 409. The Court noted two effects that competitive market pressures have on private firms. First, competitive pressures create incentives for private firms to avoid damages suits, which would reduce profits. *Id*. Second, because of these pressures, a firm whose employees "are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job." *Id*.

The Defendants seek to distinguish Sunflower from the firm in *Richardson* on the ground that Sunflower is a non-profit entity while *Richardson* involved a for-profit corporation. The Defendants argue that, because a firm's profit motive creates incentives to reduce its exposure to damages suits, a non-profit firm does not face similar competitive market pressures. The District Court rejected this

argument, reasoning that "non-profit organizations must also be concerned with their profit levels because insufficient financial resources can hinder and potentially even cripple an organization's ability to function." *Rosewood Servs.*, 2003 WL 22090897 at *23. We agree. Because non-profits must also seek to minimize their expenses, a firm's non-profit status does not shield it from this competitive pressure. *See, e.g.*, *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 82 F. Supp. 2d 901, 906 (N.D. Ill. 2000) (noting that a corporation's non-profit status does not negate the competitive pressures to minimize expenses). We therefore hold that the fact that a private firm is a non-profit entity is insufficient to shield it from market pressures such that qualified immunity is necessary to protect against unwarranted timidity by the firm and its employees.

Nonetheless, the Defendants argue that the procedures for replacing a CDDO are so burdensome that the threat of replacement by other firms is insufficient and therefore they should be permitted to claim qualified immunity. Consequently, the competitive pressures faced by Sunflower are less than those faced by firms operating in a free market. The Defendants argue that this means that Sunflower is "not really a market participant." The Defendants admit, however, that CDDOs can be replaced. Moreover, at oral argument, the Defendants conceded that Sunflower had in fact been replaced as CDDO in the relevant five counties. We conclude, for the following reasons, that the

-12-

procedures for replacing a CDDO, while cumbersome, sufficiently introduce market forces to avoid the need for qualified immunity.

In *Richardson*, the state of Tennessee was permitted by statute to cancel its contract with the private prison management firm. 521 U.S. at 410. Consequently, the Supreme Court recognized that this firm was subject to "pressure from potentially competing firms who can try to take its place." *Id*. Similarly, a CDDO may be replaced. Under regulations adopted by SRS, a prospective CDDO must submit the equivalent of a business plan, detailing the existing problems in the service area and how it will improve upon them. Kan. Admin. Regs. § 30-64-12(a)(2)–(3). The applicant's plan must also include a long-range financial plan as well as written comments from the public concerning the services received in that area. Kan. Admin. Regs. § 30-64-12(a)(7) & (10). Once this application is submitted, the Division of Mental Health and Developmental Disabilities, a subdivision of SRS, decides whether the applicant should replace the existing CDDO. Kan. Admin. Regs. § 30-64-13(b).

These replacement procedures create significant barriers to entry into the CDDO industry. Consequently, the competitive pressures faced by Sunflower are less than those faced by firms operating in a free market. Our inquiry for determining whether to allow a defendant to claim qualified immunity, however, cannot turn on whether a free market exists. As the dissent in *Richardson* notes,

whenever government officials play such a key role in an industry, a competitive free market is unlikely to exist. 421 U.S. at 418–19 (Scalia, J., dissenting) ("[I]t is fanciful to speak of the consequences of 'market' pressures in a regime where public officials are the only purchaser, and other people's money the medium of payment."). Instead, to determine whether to permit a claim of qualified immunity, we merely consider whether competitive market forces are sufficiently present such that the threat of replacement reduces employees' timidity.

The Kansas regulatory scheme is designed so that CDDOs that are not doing an adequate job will be replaced. In order to replace the existing CDDO, a prospective CDDO must submit an application to SRS that details the ineffectiveness of the current CDDO and how the applicant plans to improve services to the developmentally disabled. While these regulations may be burdensome, they are not so burdensome that CDDOs do not face the threat of replacement—as is evidenced by the fact that Sunflower has been replaced as CDDO. Because the competitive pressures associated with the threat of being replaced exist in this case, we hold that the policy considerations concerning unwarranted timidity do not favor extending qualified immunity to these Defendants.

## III. CONCLUSION

The District Court concluded that the Defendants Sunflower     and Mr.

-14-

Johnson could not assert qualified immunity for the § 1983 claims brought by the Plaintiffs.  Because policy considerations—namely, that sufficient competitive market pressures exist to lessen timidity on the part of Sunflower and its employees—do not warrant permitting the Defendants to claim qualified immunity, we AFFIRM.

No. 03-3288, <u>Rosewood Services, Inc. v. Sunflower Diversified Services</u>,

**HENRY, J.**, concurring:


I concur in the result. In my view, the record is sufficient to establish that the defendants are entitled to assert the defense of qualified immunity. In light of the regulatory and oversight responsibilities of CDDO's under Kansas law, I do not believe that the competitive pressures to which the majority refers are sufficient to protect against the risk of unwarranted timidity by those who undertake these tasks. <u>Cf.</u> <u>Bartell v. Lohiser</u>, 215 F.3d 550, 556 (6th Cir. 2000) (holding that a private contractor responsible for making foster care decisions is entitled to assert the defense of qualified immunity); <u>Pani v. Empire Blue Cross Blue Shield</u>, 152 F.3d 67, 72-74 (2d Cir. 1998) (holding that a private insurance company, acting as fiscal intermediary or carrier on behalf of the United States in administration of a Medicare program, was entitled to official immunity from suit for claims that arise out of performance of its duty to investigate and report possible Medicare fraud and rejecting the argument that the denial of immunity in <u>Richardson v. Mcknight</u>, 521 U.S. 399 (1997), supported the denial of immunity to those private entities that act "on behalf of the [government] in carrying out certain administrative responsibilities that the law imposes") (internal quotation marks omitted).

Although in <u>Richardson</u>, the Supreme Court concluded that the competitive

pressures faced by private firms managing prisons were sufficient to protect unwarranted timidity by prison guards, I think we should be wary of applying Richardson's reasoning too broadly.  The Court itself noted that:

> [W]e have answered the immunity question narrowly, in the context in which it arose.  That context is one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms.  The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential government activity, or acting under close official supervision.

Id. at 413 (emphasis added).

Nevertheless, even though I would allow the defendants to assert the defense, I would further conclude that qualified immunity is not warranted on this record.  In particular, as to the plaintiff's equal protection claim, I agree with the district court that "there is adequate evidence in the record from which it can be inferred that Sunflower treated Rosewood differently than other service providers by generally subjecting Rosewood to a higher degree of scrutiny than other service providers and by raising a variety of obstacles to attempt to stem the tide of clients transitioning their services to Rosewood."  Aplt's App. vol. I, at 32.  There is also sufficient evidence to support the plaintiff's retaliation claim.  Viewed in the light most favorable to the plaintiff, a factfinder could conclude that the defendants violated clearly established rights of which a reasonable

-2-

official would have known.

Accordingly, I would affirm the denial of summary judgment to the defendants on this alternative ground.