**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

JEFFREY SCOTT WOLFE,

        Plaintiff - Appellant,

    v.

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration; AMY COMSTOCK,
Director, Office of Government
Ethics,

        Defendants - Appellees.

No. 04-5194

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 02-CV-749-K)**

---

Jeffrey Scott Wolfe, appearing Pro Se, Broken Arrow, Oklahoma, for Plaintiff - Appellant.

Mark B. Stern, Attorney, United States Department of Justice, Washington, D.C. (Peter D. Keisler, Assistant Attorney General, Washington, D.C.; David E. O'Meilia, United States Attorney, Tulsa, Oklahoma; Alisa B. Klein, Attorney, United States Department of Justice, Washington, D.C., also on the briefs) for Defendants - Appellees.

---

Before **MURPHY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

Jeffrey Wolfe, an Administrative Law Judge ("ALJ") within the Social Security Administration ("SSA"), was denied permission to collect royalties from the publisher of a textbook he wrote on Social Security disability law. He asked the district court to overturn the agency's decision and to enter a declaratory judgment that the governing regulation, 5 C.F.R. § 2635.807(a), restricted employee speech in violation of the First Amendment. The district court denied his claims, and he appealed. We affirm the court's decision for the reasons set forth below.

## BACKGROUND

Wolfe has served as an ALJ for the SSA's Office of Hearings and Appeals ("OHA") since 1995. Prior to that time, he served as a United States Magistrate Judge for the Northern District of Oklahoma. In September 1999, Wolfe submitted a Request for Approval of Outside Activity, Form HHS-520, to OHA Regional Chief Judge JoAnn Anderson, indicating that he had been offered a contract by Delmar Publishing, a subsidiary of West Publishing, to author a text on Social Security law and practice. The contract provided for the payment of royalties. Wolfe indicated on the form that his official duties did not relate in any way to the proposed activity except "insofar as this is an area of law subject of

the academic text." R. Vol. I, tab 1 ex. A. Judge Anderson forwarded the

Request to Chief ALJ Charles Boyer, who responded to Wolfe in November 1999,

indicating that Wolfe was not prohibited from authoring the text but that he "may

not . . . accept any compensation for this activity even in the form of royalties."

Id. ex. B. Boyer explained that, pursuant to 5 C.F.R. § 2635.807, a section within

the Standards of Ethical Conduct for Employees of the Executive Branch,[1]

> [f]ederal employees are prohibited from receiving compensation from any source other than the Government for teaching, speaking, or writing that relates to official duties. Writing relates to an employee's official duties if the circumstances indicate that the invitation was extended primarily because of an employee's official position rather than the employee's expertise on the particular subject matter, or if the subject of the activity deals in significant part with any ongoing or announced policy, program or operation of the Agency. Because you are an Administrative Law Judge for Social Security and a text on Social Security law and practice deals in significant part on the Agency's policies, programs and operations, you may not accept compensation for this activity.

R. Vol. I, tab 1 ex. B (citations omitted). Wolfe requested that the OHA

reconsider its denial of approval for receiving royalties from the publication, but

the Chief ALJ confirmed his initial decision.

Wolfe then sought an advisory opinion from the United States Office of

Government Ethics ("OGE") "as to the applicability of 5 C.F.R. § 2635.807 to a

proposed book on the Social Security disability adjudicatory system." R. Vol. I,

---

[1] 5 C.F.R. §§ 2635.101 -.902.

tab 1 ex. D, at 1. The OGE agreed with the SSA OHA that the proposed work "will necessarily focus on the policies, programs, and operations of the [SSA]" and that 5 C.F.R. § 2635.807 therefore precluded Wolfe from collecting royalties from the book's publisher. R. Vol. I, tab 1 ex. D, at 1. In support of this conclusion, the OGE reasoned that, because "SSA was created by the Social Security Act for the express purpose of administering the Act, including disability claims," and because OHA handles appeals from adverse SSA determinations, "[t]he disability adjudicatory process . . . inherently involves OHA, and [Wolfe's] proposed writing will deal directly with a highly specific subject matter that OHA is integral to." Id. at 2-3 (footnotes omitted). According to the OGE, the proposed book would be, "in effect, a manual for handling cases in which SSA components, and more specifically OHA, will necessarily be involved." Id. at 3. The OGE further indicated that the book's subject matter was "integral to the job of an SSA ALJ" such as Wolfe, whose "role is defined by the disability adjudicatory process, and is to apply the rules that will be the focus of the book." Id.

In July 2002, Wolfe's book, coauthored with Lisa Proszek and entitled Social Security Disability and the Legal Professional, was published. Also in July 2002, Randolph Gaines, the SSA's Designated Agency Ethics Official, issued a final decision affirming the denial of permission to collect royalties and

-4-

supporting the OGE's interpretation of 5 C.F.R. § 2635.807. In doing so, Gaines rejected Wolfe's argument that he "w[as] requested to write the book, not as a result of [his] current position as an [ALJ] for the [SSA], but because of [his] unique background and experience" as a magistrate judge, which gave him "an expertise in Social Security disability law and appeals that predate[d] [his] appointment as an ALJ." R. Vol. I, tab 1 ex. E, at 1. Gaines indicated that even if this were so, Wolfe was precluded from collecting royalties because the subject matter of the work "deals in significant part with SSA's ongoing policy, programs or operation." Id. at 2.

Wolfe then filed suit in federal district court, naming the SSA Commissioner and OGE Director as defendants and arguing that the SSA's decision denying approval for Wolfe to receive compensation for the publication of his book was based on an incorrect interpretation of 5 C.F.R. § 2635.807, and, in addition, that 5 C.F.R. § 2635.807 violated the First Amendment. Wolfe's complaint requested that the court reverse the SSA's decision and that the court issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the regulation, both "as promulgated by OGE and as interpreted and applied by" the SSA and OGE, was unconstitutional. Complaint at 4, R. Vol. I, tab 1. Wolfe and the defendants filed cross-motions for summary judgment, which were referred to a magistrate judge for a report and recommendation. Following a hearing, the

magistrate judge recommended that summary judgment be granted in favor of the defendants. Wolfe objected to this recommendation. However, the district court concluded that there was "no reason to depart" from the magistrate judge's conclusions and adopted and affirmed the magistrate judge's report and recommendation. Order, R. Vol. I, tab 64.

Wolfe then filed this appeal of the district court's entry of summary judgment in favor of the defendants, arguing (1) that the SSA's action violates the injunction ordered by the United States District Court for the District of Columbia in Sanjour v. EPA, 7 F. Supp. 2d 14 (D.D.C. 1998), (2) that the SSA's refusal to allow him to collect royalties was based on a misinterpretation of 5 C.F.R. § 2635.807, and (3) that 5 C.F.R. § 2635.807 violates the First Amendment.

**DISCUSSION**

Our review of a district court's grant or denial of summary judgment is de novo, applying the same legal standard employed by the district court. Maldonado v. City of Altus, 433 F.3d 1294, 1302 (10th Cir. 2006). Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, neither party suggests any dispute in regard

to the facts. They disagree only in regard to which of them is entitled to a judgment as a matter of law.

In addition, because the SSA is a federal agency, our review of Wolfe's request that we reverse its decision denying him permission to collect royalties from his book's publication is conducted pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Section 706(2) of the APA "provides that agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1078, 1084 (10th Cir. 2004) (internal quotation omitted) (referring to 5 U.S.C. § 706(2)(A), (B), (C), (D)). "When we review an agency's decision under the [APA's] arbitrary, capricious or abuse of discretion standard, our review is narrow and deferential; we must uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors." Slingluff v. Occupational Safety & Health Review Comm'n, 425 F.3d 861, 866 (10th Cir. 2005) (citing Mountain Side Mobile Estates P'ship v. Sec'y of HUD, 56 F.3d 1243, 1250 (10th Cir. 1995)). "However, these limitations do not apply to questions of law." Id.

Wolfe's arguments, as set forth above, present legal issues. His request that we set aside the SSA's decision as unlawful agency action under the APA

rests on the contention that this decision was "contrary to law" under 5 U.S.C. § 706(2)(A)[2] and "contrary to constitutional right" under 5 U.S.C. § 706(2)(B).

## I.    EFFECT OF SANJOUR INJUNCTION

Wolfe argues that the SSA's decision implementing 5 C.F.R. § 2635.807(a) violates an injunction issued by the District Court for the District of Columbia in Sanjour v. EPA ("Sanjour II"), 7 F. Supp. 2d 14 (D.D.C. 1998).  However, we agree with the government appellees and the district court that the Sanjour II injunction has no bearing on this case because it applied only to travel expense reimbursement.  In Sanjour II, the court issued an injunction "against the enforcement of restrictions placed on reimbursement for reasonable non-official travel expenses as prohibited . . . under 5 C.F.R. §[] 2635.807(a)."  Id. at 21.  The district court granted this injunction on remand in response to a decision by the

_____

[2]Wolfe does also claim that the SSA's decision was arbitrary and capricious, but this claim appears to rest solely on the assumption that it would be arbitrary and capricious for an agency to act based on its incorrect interpretation of the law.  Because we ultimately uphold the SSA's interpretation under a correctness standard, we need not pursue the question of whether the more deferential arbitrary and capricious standard is implicated here.  Cf. Van Ee v. EPA, 202 F.3d 296, 301 (D.C. Cir. 2000) (applying de novo standard to question of whether agency correctly interpreted 18 U.S.C. § 205, which imposes criminal penalties on certain federal employee conduct involving conflicts of interest); U.S. Dep't of Transp. v. Fed. Labor Relations Admin., 145 F.3d 1425, 1426 (D.C. Cir. 1998) (applying arbitrary and capricious standard to agency's refusal to address argument concerning interpretation of ethics regulations).

Court of Appeals for the D.C. Circuit that concerned the different standards set forth in the then-current § 2635.807(a) and in a General Services Administration ("GSA") regulation, 41 C.F.R. § 304-1.3(a) (1994),[3] for receiving travel reimbursement from private sources. See Sanjour v. EPA ("Sanjour I"), 56 F.3d 85, 88-89 (D.C. Cir. 1995) (en banc). Specifically, the court in Sanjour I held that "prohibiting EPA employees from receiving travel expense reimbursement from private sources for unofficial speaking or writing engagements concerning the subject matter of the employees' work, while permitting such compensation for officially authorized speech on the same issues," was inconsistent with First Amendment protections for government employees. Id. at 87.

Nowhere in Sanjour I or Sanjour II is there any indication that the courts' rulings applied to any form of compensation other than travel expense reimbursement. Also significant in this regard, the GSA regulations at issue in Sanjour I were themselves specifically limited to travel expense reimbursement. See 41 C.F.R. §§ 304-1.1 to -3.19. Thus, it is clear that the injunction issued in Sanjour II applied solely to travel reimbursement restrictions, not to other forms of compensation, such as the royalties at issue here. Furthermore, following the opinions in Sanjour I and Sanjour II, the OGE amended § 2635.807(a) by adding

---

[3]The chapter containing this GSA regulation has since been amended. See 68 Fed. Reg. 12602 (Gen Servs. Admin. Mar. 17, 2003) (promulgating amendments to 41 C.F.R. §§ 304.1.1 -.9.7).

§ 2635.807(a)(2)(iii)(D), which exempts travel expenses from the general compensation restrictions set forth in the regulation.  See 65 Fed. Reg. 53650, 53651 (Off. Gov't Ethics Sept. 5, 2000).  Wolfe argues that this amendment "only affected a narrow portion of the regulation."  Appellant's Op. Br. at 23.  However, as discussed, the portion affected was in fact the only portion that Sanjour I had held unconstitutional.  We therefore reject Wolfe's claim that the SSA's decision is contrary to law on this basis.

## II.   INTERPRETATION OF 5 C.F.R. § 2635.807

Wolfe also argues that, contrary to the SSA's interpretation, 5 C.F.R. § 2635.807 by its terms does not preclude him from receiving compensation for the publication of his book.  This regulation, which, as noted above, is part of the Standards of Ethical Conduct promulgated by the OGE,  prohibits an executive branch employee from "receiv[ing] compensation from any source other than the Government for teaching, speaking or writing that relates to the employee's official duties."  5 C.F.R. § 2635.807(a).  The regulation then specifies that "[t]eaching, speaking or writing relates to the employee's official duties if," among other things, "the subject of the activity deals in significant part with[] *(1)* [a]ny matter to which the employee presently is assigned or to which the employee had been assigned during the previous one-year period[] [or] *(2)* [a]ny

-10-

ongoing or announced policy, program or operation of the agency." Id.
§ 2635.807(a)(2)(i)(E)*(1)-(2)*.

As described above, the SSA concluded that outside compensation was not permitted for Wolfe's book because the content of the book dealt with the policies, programs, and operations of the SSA. Wolfe does not argue that the SSA was incorrect in its determination that the textbook does deal with SSA policies, programs, and operations. Rather, he focuses primarily on an explanatory Note following this portion of the text of the regulation. This Note states that

> [subsection] (E) does not preclude an employee . . . from receiving compensation for teaching, speaking or writing on a subject within the employee's discipline or inherent area of expertise based on his educational background or experience even though the teaching, speaking or writing deals generally with a subject within the agency's areas of responsibility.

Id. § 2635.807(a)(2)(i) (Note).

According to Wolfe, this Note "is reasonably read to provide an exception to the compensation ban where the speaker/writer has 'inherent expertise' in the proposed topic of his or her speech, such expertise having been acquired apart from his or her current government service." Appellant's Op. Br. at 18-19 (footnote omitted). Wolfe attributes the SSA's conclusion that his textbook does not fit within this exception to the agency's misinterpretation of the term "generally" in the text of the Note. He asserts that if the word "generally" is

-11-

properly understood to mean "for the most part," rather than the opposite of "specifically," it becomes clear that the Note applies to his textbook.

Where Wolfe errs in his analysis is in treating the activity described in the Note—writing generally on a subject within one's inherent area of expertise—as a subcategory that is excepted from the general category of activities that, under the terms of 5 C.F.R. § 2635.807(a)(2)(E)*(2)*, deal in significant part with an agency's policies, programs, or operations. In effect, under Wolfe's interpretation, receiving compensation for activities that deal with an agency's policies, programs, or operations is only prohibited if the source of the employee's knowledge that allows him to engage in the activity is something other than his inherent expertise in the area. Thus, in Wolfe's view, he is entitled to collect royalties for his book because the content of the work reflects his preexisting expertise in Social Security disability law rather than his experience as an ALJ. Such a result makes little sense in light of the language of § 2635.807(a)(2)(E)*(2)* itself, which focuses on what the content of the activity is rather than on how the employee became knowledgeable about that subject.

In our view, the explanatory Note does not set forth an exception to the regulatory language in § 2635.807(a)(2)(E). Rather, the Note clarifies that a career agency employee may receive compensation where the content of his work falls within his agency's general area of responsibility if neither of the specific

prohibitions in § 2635.807(a)(2)(i)(E)*(1)* or *(2)* apply. Moreover, even if we were to view the regulation as unclear, we would reach the same conclusion based on the interpretation provided by the OGE.[4] See Rules & Regulations, 57 Fed. Reg. 35006, 35039 (Off. Gov't Ethics Aug. 7, 1992) (indicating that the purpose of the Note is "to clarify that an employee may accept compensation for teaching, speaking or writing about a matter within his or her general expertise and which relates generally to an agency's activities, as long as it does not deal in significant part with the specific matters to which the employee is or, within the past year, has been assigned, or to any ongoing or announced policy, program or operation of the agency" (emphasis added)). As the government points out, the Note thus clarifies the distinction between career employees and noncareer employees, who may not receive compensation for activities that deal with "the general subject matter area . . . primarily affected by the programs and operations of his agency." 5 C.F.R. § 2635.807(a)(2)(i)(E)*(3)*. Consistent with its explanation in the Federal Register, the OGE, as described above, rejected Wolfe's interpretation of the Note in the advisory opinion that Wolfe had requested. We agree with the OGE and

_____

[4]See Excel Corp. v. U.S. Dep't of Agric., 397 F.3d 1285, 1296 (10th Cir. 2005) (indicating that we accord deference to formal and informal agency interpretations of ambiguous regulations that they have promulgated "unless those interpretations are plainly erroneous or inconsistent with the regulation" (internal quotation omitted)); see also In re Wal-Mart Stores, Inc., 395 F.3d 1177, 1185 (10th Cir. 2005).

the SSA that the Note provides no support for Wolfe's argument that the regulation by its terms does not prohibit him from collecting royalties for his textbook.

In addition to his reliance on the Note, Wolfe argues that the publication of his textbook falls under the explicit exception for teaching certain courses, set forth in 5 C.F.R. § 2635.807(a)(3). As the government points out, Wolfe did not raise any such argument before the district court. Although Wolfe in his reply brief quotes extensively from his district court pleadings in an effort to contest this point, our review of the record indicates that his arguments below regarding the interpretation of § 2635.807 only concerned the Note, and his only reference to the teaching exception indicated that he did not regard that exception as applying to his situation, which is in direct conflict with the argument he now asserts. We therefore deem this argument waived.[5] See Rosewood Servs., Inc. v.

---

[5]The SSA also suggests that the argument is waived because Wolfe did not raise it before the agency. In many situations, arguments must be raised before an administrative agency in order for them to be preserved. Sims v. Apfel, 530 U.S. 103, 108-10 (2000) (indicating issue exhaustion is generally required in review of adversarial administrative proceedings or where exhaustion is mandated by agency regulation); see also Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 783 (10th Cir. 2006) (indicating that arguments not raised before the agency during its compliance with NEPA's procedural requirements are waived); Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1150 (D.C. Cir. 2005) (deeming arguments waived where party failed to raise them during agency rulemaking process). However, we need not consider whether such a requirement is appropriate here as we deem Wolfe's argument

(continued...)

-14-

Sunflower Diversified Servs., Inc., 413 F.3d 1163, 1167 (10th Cir. 2005)

(arguments not raised in the district court are waived).

We therefore reject Wolfe's contention that the SSA's denial of permission

to receive compensation was based on an incorrect interpretation of 5 C.F.R.

§ 2635.807.


## III.    FIRST AMENDMENT

Finally, Wolfe argues that the compensation restrictions in 5 C.F.R.

§ 2635.807(a) violate the First Amendment.[6]  This claim rests on the well-

established premise that federal government employees retain their First

Amendment rights "'to comment on matters of public interest.'"  United States v.

---

[5](...continued)
waived on another ground.

[6]As noted above, Wolfe has requested a declaratory judgment that 5 C.F.R. § 2635.807 violates the First Amendment, and he has also requested that the SSA's decision be set aside on that basis.  Although the latter form of relief, which is aimed at a final agency action, falls under the APA, Wolfe's First Amendment challenge to the regulation itself, as the magistrate judge observed, stands independent of the APA.  See Sanjour I, 56 F.3d at 90-99 (considering First Amendment challenge to federal agency regulation without reference to APA); Nat'l Council for Improved Health v. Shalala, 122 F.3d 878, 883 (10th Cir. 1997) (indicating that an individual may bring a First Amendment claim against a federal agency regulation as long as the individual has standing to do so).  The magistrate judge indicated that this distinction allowed him to review Wolfe's textbook for purposes of his First Amendment claim even though the textbook was not part of the administrative record.  However, neither party has submitted the textbook or any other material outside the administrative record or lower court pleadings to this court as part of the record on appeal.

Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995) ("NTEU") (quoting

Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  Here, as the magistrate

judge concluded, and as the government does not contest, the topic of Wolfe's

book, Social Security disability law, clearly falls into the category of "matters of

public interest."  See City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004)

(interpreting a matter of public interest or concern as "something that is a subject

of legitimate news interest; that is, a subject of general interest and of value and

concern to the public at the time of publication"); NTEU, 513 U.S. at 466

(including as "within the protected category of citizen comment on matters of

public concern" expression that was "addressed to a public audience, w[as] made

outside the workplace, and involved content largely unrelated to . . . government

employment"); Connick v. Myers, 461 U.S. 138, 146 (1983) (defining this

category as including "employee expression [that] can[] be fairly considered as

relating to any matter of political, social, or other concern to the community").

However, even when employee speech falls into that category, the

government "may impose restraints . . . that would be plainly unconstitutional if

applied to the public at large."  NTEU, 513 U.S. at 465.  In assessing the validity

of such restraints under the First Amendment, a court must "arrive at a balance

between the interests of the [employee], as a citizen," in speaking, "and the

interest of the [government], as an employer, in promoting the efficiency of the

public services it performs through its employees." Pickering, 391 U.S. at 568; see also Belcher v. City of McAlester, 324 F.3d 1203, 1207 (10th Cir. 2003).

The balancing test established in Pickering applies when the government takes an adverse employment action based on its "*post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities." NTEU, 513 U.S. at 467. Wolfe argues that the government's burden here is heavier than it is in such post hoc cases because, like the statute considered by the Supreme Court in NTEU, the OGE regulation at issue, 5 C.F.R. § 2635.807(a), imposes a prior restraint on employee speech.

In NTEU, the Supreme Court considered the constitutionality of a subsection of the Ethics in Government Act of 1978, as amended, 5 U.S.C. App. 4 § 501(b), which prohibited government employees from accepting honoraria from outside sources for appearances, speeches, or articles. 513 U.S. at 459. This prohibition applied even where the subject matter of an employee's speech was unrelated to his government employment and the speech took place outside the workplace. Id. at 466. The Court reasoned that the honoraria ban in § 501(b) "unquestionably imposes a significant burden on expressive activity" and that the ban "chills potential speech before it happens." Id. at 468. It therefore held that the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future

-17-

expression are outweighed by that expression's necessary impact on the [government's] actual operation." Id. (internal quotation omitted). The government's burden was to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. at 475 (internal quotation omitted). In that case, the government was unable to meet this heavy burden.

This circuit has suggested that NTEU may not apply to a policy requiring employees to speak English at work where it was unclear that speaking in Spanish necessarily involved a matter of public concern. See Maldonado, 433 F.3d at 1314. In addition, we have applied the traditional Pickering test, rather than NTEU, where a city imposed disciplinary action based on an employee's violation of regulations that, unlike the statute at issue in NTEU, affected "only a relatively small group of employees" and "only applied to comments made *in private* to [City] Council members." Belcher, 324 F.3d at 1206 n.3.

The OGE regulation at issue here, however, is not distinguishable on either of these bases from the statute considered in NTEU. Like that statute, the OGE regulation applies to a broad spectrum of federal employees and imposes general restrictions on these employees' eligibility to receive outside compensation for expressive activity. As a result, it, like the statute, constitutes a prior restraint on

employee speech.[7]  A number of other circuits have concluded that the NTEU

analysis applies to restrictions on employee speech that are imposed through such

a generally applicable policy, rather than a post hoc case-by-case disciplinary

process.  See Crue v. Aiken, 370 F.3d 668, 678 (7th Cir. 2004) (applying NTEU

to university directive requiring faculty and students to obtain advance permission

to contact prospective student athletes regarding school mascot); Swartzwelder v.

McNeilly, 297 F.3d 228, 235 (3d Cir. 2002) (applying NTEU to police bureau

policy requiring officers to obtain advance authorization before giving expert

testimony in court proceedings); Harman v. City of New York, 140 F.3d 111, 118

(2d Cir. 1998) (applying NTEU to policies requiring employees to obtain advance

---

[7]Indeed, the Federal Register entry that initially recorded the promulgation of 5 C.F.R. § 2635.807 listed the Ethics in Government Act as an authorizing statute for the regulation.  57 Fed. Reg. 35006, 35042 (Off. Gov't Ethics Aug. 7, 1992).  We note that although this fact might appear to raise a question concerning the continuing validity of the OGE regulation following the Court's ruling in NTEU, the more direct authority for the OGE's promulgation of the Standards of Ethical Conduct for Employees of the Executive Branch came from the President rather than from Congress.  See Exec. Order No. 12674, 54 Fed. Reg. 15159 (Apr. 12, 1989), as amended by Exec. Order No. 12731, 55 Fed. Reg. 42547 (Oct. 17, 1990) (delegating to the OGE the responsibility to administer the Order by, among other things, promulgating regulations governing executive branch employee conduct).  In contrast, 5 C.F.R. Part 2636 directly implemented the statutory honoraria ban and was accordingly amended by the OGE following NTEU in order to "remov[e] obsolete executive branch regulatory provisions implementing the statutory honorarium bar, which is no longer legally operative." 63 Fed. Reg. 43067, 43067 (Off. Gov't Ethics Aug. 12, 1998).  Because, furthermore, § 2635.807(a) only limits compensation for expressive activities related to an employee's official duties, we do not believe NTEU automatically invalidated that provision.

permission before speaking to media); Sanjour I, 56 F.3d at 91 (applying NTEU

to travel expense reimbursement restrictions set forth in regulations). In accord

with those decisions, we agree with Wolfe that NTEU's modification of the

Pickering balancing test applies under these circumstances. However, we believe

the government has met even this heavier burden in regard to the compensation

restriction at issue here.

In applying the modified test, we first set forth the government's asserted

interest. In their brief, the government appellees state that "[a] restriction on

compensation for writing related to official duties ensures that employees will not

attempt to profit from their position in this manner, and precludes the appearance

of such impropriety." Appellees' Br. at 26. The government appellees further

suggest that the restriction also "ensures that public employees will not undertake

as a profit-making project an activity that might have been performed for the

benefit of the agency and the public without charge." Id.

The importance of the government's interest in avoiding impropriety or the

appearance thereof among its employees is well established. See Crandon v.

United States, 494 U.S. 152, 164 (1990) ("Congress appropriately enacts

prophylactic rules that are intended to prevent even the appearance of wrongdoing

[by its employees] . . . ."). Underlying this concern is the "legitimate interest in

maintaining the public's confidence in the integrity of the federal service, id. at

-20-

164-65, which in turn contributes to the government's effectiveness. See Waters v. Churchill, 511 U.S. 661, 675 (1994) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.").

Although the government asserted this same interest in NTEU, the Court overturned the statute at issue in that case in the absence of further evidence that would substantiate an actual risk of harm. 513 U.S. at 472. However, the feature that distinguishes the OGE regulation here from NTEU's statutory honoraria ban is that, under the terms of the regulation, outside compensation for expressive activity is restricted only when the activity "relates to the employee's official duties." 5 C.F.R. § 2635.807(a). In contrast, the Supreme Court in NTEU emphasized that the honoraria ban applied even where there was no nexus at all between the employee's outside expressive activity and his employment, and that the plaintiffs' activities, specifically, were mostly unrelated to their employment. 513 U.S. at 466, 476. The Court observed that, "[a]bsent such a nexus, no corrupt bargain or even appearance of impropriety appears likely." Id. at 474.

Where such a nexus exists, however, the government's "underlying concern . . . that federal officers not misuse or appear to misuse power by accepting compensation for their" outside activities is directly implicated. See id. at 472.

Indeed, the Court in NTEU cited a General Accounting Office ("GAO") report supporting restrictions on "outside activities 'that were focused specifically on the [employing] agencies' responsibilities and/or related directly to the employees' duties.'" Id. at 472 n.18 (quoting GAO report at 13-14).

The fact that § 2635.807(a) expressly incorporates a nexus requirement between the employee's speech and the employee's official duties renders it narrowly tailored to serve the government's asserted interest in avoiding employee impropriety or the appearance of impropriety. Other courts have recognized that the tailoring requirement is an important aspect of the Pickering/NTEU analysis. See Swartzwelder, 297 F.3d at 240 (rejecting, in Pickering/NTEU analysis, restriction that was not "carefully crafted to serve th[e] [government's] interest"); Harman, 140 F.3d at 123 (holding city policy was not "designed to address the asserted harm in a 'direct and material way,'" rendering the prior restraint "overbroad" under NTEU); Sanjour I, 56 F.3d at 97 (recognizing that Pickering balance requires "consider[ation] [of] whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect"). In NTEU, the Supreme Court implicitly approved such an express nexus condition as sufficient to meet the tailoring requirement when it criticized the lower court's issuance of an injunction that "prohibits enforcement of the [honoraria ban] even when an obvious nexus exists

-22-

between the employee's job and either the subject matter of his or her expression or the interest of the person paying for it." 513 U.S. at 476;[8] see also Sanjour I, 56 F.3d at 101 (Sentelle, J., dissenting) (emphasizing that § 2635.807(a) "confines the affected speech to that having such a nexus").

Wolfe disputes the government's assertion that the receipt of compensation in cases such as his might create an appearance of impropriety. Essentially, he argues that the nexus requirement incorporated in the OGE regulation is itself not sufficiently narrowly tailored because it applies to his own situation, which, he argues, has no harmful effect. In Wolfe's view, it seems, the regulation would be acceptable if it contained an exception for academic textbooks, such as his, published by major academic textbook publishers, such as his publisher.

In support of this argument, Wolfe points to the teaching exception in 5 C.F.R. § 2635.807(a)(3). He emphasizes that he was allowed under that exception to receive compensation for teaching a course on Social Security disability law

---

[8]Wolfe's suggestion that § 2635.807(a) is necessarily invalid because the SSA and OGE have "done here precisely what the Supreme Court refused to do in NTEU" by "craft[ing] a prior restraint based solely on a nexus between Appellant's official duties and the textbook" is meritless. Appellant's Op. Br. at 14. When the Court in NTEU refused to "craft[] a nexus requirement for the honoraria ban" in order to save the statute from being held invalid, it was clearly concerned with overreaching its judicial function. 513 U.S. at 479. Its statement certainly does not indicate that a nexus requirement is invalid when imposed by an agency acting within its authority.

"even though the text for the course was the very same text for which the Agency had earlier denied compensation." Appellant's Br. at 16.

However, as the government points out, the teaching exception only applies when the entity providing compensation is either an accredited educational institution or a federal, state, or local governmental entity. See 5 C.F.R. § 2635.807(a)(3)(i)-(ii). Because of the identity of the payor in such cases, the OGE reasoned that there was little risk of unethical behavior or the appearance of impropriety. See 56 Fed. Reg. 33778, 33790 (Off. Gov't Ethics July 23, 1991) (explaining that the exception "recognizes the contribution Federal employees can and should make to education in their fields of expertise under circumstances where there is little possibility that they or those who secure their teaching services will unfairly benefit from their government positions"). This narrow exception does not undermine the careful crafting of the compensation restriction as a whole.

Nor does the fact that the OGE has not seen fit to extend this exception to private legal publishing corporations, as Wolfe urges is appropriate. There is a clear distinction between accredited educational and governmental entities and private commercial publishers. For one thing, as the government points out, there is no accreditation process in place that could identify what Wolfe refers to as a "recognized educational/textbook publisher," Appellant's Op. Br. at 30, as

-24-

distinct from a publisher with regular commercial interests. Wolfe's further suggestion that such an exception be limited to cases where the textbook's author is engaged in teaching a related class simply appears unworkable since, as the government points out, an individual may teach a course one semester but not the next, and royalties may accrue during the periods when no related course is being taught by the author.

In further support of his argument that the OGE regulation's failure to except textbooks renders it overinclusive, Wolfe points out that "there is nothing on the face of the text[book] which indicates whether or not any compensation has been allowed." Appellant's Op. Br. at 22 n.29. However, that fact does not guarantee that the receipt of outside compensation would remain unknown, and if it was indeed impossible to obtain such information, it would seem only to increase the risk of actual impropriety. We therefore reject Wolfe's suggestion that the OGE regulation is not sufficiently narrow unless it excepts the activity in which he was engaged.

Two other factors weigh in our conclusion that the compensation restriction in § 2635.807 does not violate the First Amendment under an NTEU balancing analysis. First, while restrictions on outside compensation do, as we have explained, impose a significant burden on an employee's right to speak, and the public's right to hear such speech, 513 U.S. at 470, the burden here is not as great

-25-

as that in <u>Sanjour I</u>, where the regulations at issue "den[ied] government employees the ability to recover even necessary travel expenses" to fund their outside expressive activities. 56 F.3d at 94; <u>see also</u> <u>Swartzwelder</u>, 297 F.3d at 239 (suggesting that the court might have upheld the policy at issue if it "simply barred an employee . . . from receiving a fee for providing expert testimony related to the employee's official duties" rather than requiring advance approval for any such testimony). Here, for example, Wolfe did write and publish his textbook even though he was unable to collect royalties on it.[9] Moreover, unlike in <u>NTEU</u>, where federal employees could not receive honoraria for expressive activities involving a broad range of topics, the OGE regulation here would allow compensation when the topic is unrelated to an employee's duties. Thus, Wolfe could collect royalties if he published a textbook in some other area of the law not directly related to his duties as an SSA ALJ.

Second, the restriction on compensation is not the type of speech restriction that would promote government censorship based on the employee's viewpoint. Other courts applying <u>NTEU</u> have indicated that the risk of such censorship was a primary concern in determining the validity of restrictions. <u>See</u> <u>Crue</u>, 370 F.3d at

---

[9]We note that, by Wolfe's own admission, his incentive for publishing may not be limited to financial compensation, as publication is of significant professional value in the academic community, and Wolfe "is a long-time member of the adjunct faculty at the University of Tulsa, College of Law." Appellant's Reply Br. at 6.

680 (holding that university community's speech interest "is not outweighed by [the university's] fear that an athletic association might not approve of what [members of the community] say"); Swartzwelder, 297 F.3d at 240 (expressing concern at the vagueness of the standard to be applied in implementing advance-approval requirement); Harman, 140 F.3d at 121 (observing that advance-approval requirement "inherently disfavors speech that is critical of agency operations" and would "discourage speakers with dissenting views from coming forward"); Sanjour I, 56 F.3d at 97 (criticizing the regulatory scheme under review as "vest[ing] essentially unbridled discretion in the agency to [approve or disapprove travel expense reimbursement] on the basis of the viewpoint expressed by the employee"). Unlike the requirements struck down in those cases, the applicability of the compensation restriction in 5 C.F.R. § 2635.807(a) depends on a viewpoint-neutral standard—whether an employee's outside activity is related to his official duties.

In light of these considerations, we uphold the validity of the compensation restrictions in 5 C.F.R. § 2635.807(a) against Wolfe's First Amendment challenge.[10]

_____

[10]Wolfe characterizes his First Amendment challenge as divided into "facial" and "as-applied" challenges. See Appellant's Op. Br. at 2, 15. In effect, he confuses the First Amendment's overbreadth doctrine, which grants standing to claimants asserting facial challenges to regulations that are clearly constitutional
(continued...)

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[10](...continued)
as applied to them, with the consideration of whether a regulation is overinclusive and thus not narrowly drawn under Pickering/NTEU. See Sanjour I, 56 F.3d at 91-92 & n.10 (explaining the overbreadth doctrine and concluding that the distinction between "facial" and "as-applied" challenges "is largely irrelevant in the context of the Pickering/NTEU analysis"). We have addressed the arguments Wolfe submitted in support of his "facial" challenge in the course of our analysis above.